## FOWLES, Appellant, v. BENTLEY and NEWBERRY, Respondents.

St. Louis Court of Appeals. Argued, January 4; Opinion Filed. January 26, 1909.

1. NOTICE: Recording Instrument: Acknowledgment. Section 3118, Revised Statutes 1899, providing that certain instruments, though not acknowledged, after being recorded a year in the office of recorder of deeds shall impart notice of their contents does not apply to a contract to convey real estate recorded after 1887.

2. EQUITY: Contract of Sale: Lien. In an action to enforce a lien brought upon a contract for the purchase of real estate where such real estate, after the contract was made, had been by the seller conveyed to third parties without notice of the contract, a court of equity could not grant the purchaser a lien upon the premises for any sum which might be due him on account of a violation of the contract by the seller.

3. ———: ———: ———: Damages in Lieu of Equitable Relief. In such action where the plaintiff did not establish any right to equitable relief against the defendant or against her grantees, the court could not award damages for breach of the contract.

Appeal from Audrain Circuit Court.—*Hon. Jas. D. Barnett,* Judge.

AFFIRMED.

*S. D. Stocks* and *Robertson & Robertson* for appellant.

(1) The enforcement of plaintiff's lien against the land he had bought is one of the recognized heads of the equity jurisprudence, and is not attainable in a

simple action at law for damages, and hence there is a prerogative jurisdiction in equity for this relief, and a court of equity having once acquired jurisdiction will retain it to do complete justice. McGhee v. Bell, 170 Mo. 135; Holland v. Anderson, 38 Mo. 55; Real Estate Sav. Inst. v. Collonius, 63 Mo. 290; Lanyon v. Chesney, 186 Mo. 556.   (2)  If the right asserted is a subject of original equity jurisdiction the court will entertain it even though there may be a remedy at law.  Lime and Cement Co. v. Bank, 158 Mo. 280; Smoot v. Judd, 161 Mo. 690; Seidell v. Cornwell, 166 Mo. 56; Stewart v. Caldwell, 65 Mo. 536; Pratt v. Clark, 57 Mo. 189; Story on Eq. Juris., sec. 80.   (3)  The record clearly discloses the fact that the court took and heard the cause as an action in equity, that it was so considered and acted on throughout, and a decree was rendered on the merits as between the appellant and respondent, Newberry. The court was possessed of the action and held the *res* within its grasp, and no rule is better settled, than that.  A court of equity which has obtained jurisdiction of a controversy on any ground or for any purpose will retain such jurisdiction for the purpose of administering complete relief and doing entire justice with respect to the entire subject-matter.  16 Cyc. 106; Houston v. Faul, 86 Ala. 232; Vaughan v. Bowie, 30 Ark. 278; Cook County v. Davis, 143 Ill. 151; Albrecht v. Lumber Co., 126 Ind. 318; Seibert v. Thompson, 8 Kan. 65; Snyder v. Snyder, 131 Mich. 658. (4)  When a court of equity has acquired jurisdiction of a cause, it will not release its grasp on the *res*, until it has avoided a multiplicity of suits by doing full adequate and complete justice between the parties— it will not content itself in this regard by any half way measures, it will not declare a party has been defrauded of his rights and then dismiss him with a blind permission to assert at new cost and further delay these rights in another forum.  Real Estate Sav. Inst. v. Collonius, 63 Mo. 290; Corby v. Bean, 44 Mo. 379;

Rozier v. Griffin, 31 Mo. 171; Keeton v. Spradling, 13 Mo. 321; Primm v. Raboteau, 56 Mo. 407; McDaniel v. Lee, 37 Mo. 204; 1 Story, Eq., Jur., secs. 64K, 71; Mathison v. St. Louis, 156 Mo. 202; Snyder v. Arn, 187 Mo. 177; Hagen v. Bank, 182 Mo. 343; Dysart v. Crow, 170 Mo. 281; Boland v. Ross, 120 Mo. 216; Ryburn v. Mitchell, 106 Mo. 378; Humphreys v. Milling Co., 89 Mo. 553; Blair v. Railroad, 89 Mo. 388; Shickles v. Watts, 94 Mo. 419.

*P. H. Cullen* and *F. R. Jesse* for respondents.

STATEMENT.—On the 26th of December, 1902, the appellant Fowles and one of the respondents, Mrs. Mary Bentley, the latter acting through Thos. F. Roden, her agent, entered into a contract in which it is recited that Mrs. Bentley "sells and agrees to convey" to Fowles certain real estate in Audrain county, Missouri, by warranty deed on or before the first of March, 1903, Mrs. Bentley undertaking to convey the fee clear of all incumbrances except a mortgage securing $1,000, payable to one Franey. Mrs. Bentley by the agreement also undertook to furnish a complete abstract of title down to March first, to pay the taxes for the year 1902, and to turn over possession of the property to appellant on or before the first of March, 1903, and the appellant in consideration of these covenants and agreements contracted to pay to Mrs. Bentley $4,520, of which $450 was to be cash in hand and the balance, after deducting the mortgage above mentioned, to be payable March 1, 1903. It is further stipulated in this contract "that the time of performance of both parties to the agreement is an essential element of this contract;" and further that either party to the contract "who shall fail or refuse their part of this contract shall pay to the other the sum of $200, said sum being hereby agreed upon as the liquidated damages to be sustained by either party from the failure or default

on the part of the other." This contract was signed
by appellant and by Roden as agent for Mrs. Bentley.
It was not acknowledged either by the agent or by Mrs.
Bentley nor by appellant, but was filed in the office of
the recorder of deeds of Audrain county, on the 26th
day of August, 1903, and entered of record in the deed
records of that county. It was signed and entered into
at Mexico, in Audrain county, and it appears that Mrs.
Bentley was then and at the time of the institution of
the suit and service of summons on her and ever since
has been a resident of the city of St. Louis. It fur-
ther appears that on the third of March, 1903, Mrs.
Bentley appeared at the office of the appellant in Mex-
ico, in company with her agent, Mr. Roden, and there
met appellant. There were present appellant, his son
Claud, who seems to have been associated in this deal
with his father, Mrs. Bentley and Mr. Roden. In the
course of the conversation, according to Mr. Claud
Fowles, Mrs. Bentley said to appellant, "I came up to see
about the closing up of that trade;" to which appellant
replied, "We are not quite ready to close it up today,
Mrs. Bentley. We would like to have a few days more
on it." Mr. Claud Fowles further testified to the ef-
fect that conversation then took place between them as
to what length of time appellant would have on the
contract and Claud Fowles had the stenographer in
their office write out a ten-day extension on the back
of the contract. He asked Mrs. Bentley to sign it, but
she refused to do so, or to sign any other paper ex-
tending the time, but merely stated that she would
give an extension of time; "did not make it definite";
and that Mrs. Bentley then went on to state that she
wanted to rent the place, that she had a party in view
she could rent it to for $300, and if the place was
rented the year's rent, providing the place was sold
before the cropping season was over, could go with the
sale of the place, "and she left the office with that
understanding in her mind and ours, that we were to

have an indefinite time to sell the land." Witness repeated in answer to questions that Mrs. Bentley stated she would sign no written agreement as to the amount of time appellant should have, but for him to go ahead and handle the place; that she wanted to get her money out of the place, was in a position she could not handle it herself except through an agent and she wanted to sell it and close out her business in Audrain county and for appellant or his firm to go ahead and handle it as best they could; that she would rent the place and would not be inconvenienced by appellant's firm handling it. The witness further testified that Mrs. Bentley said nothing about an abstract; if she had one with her witness did not see it; nothing was said by her about a deed and if she had a deed with her this witness did not see it; that the whole conversation was concerning the extension of time. On cross-examination Mr. Claud Fowles testified that what Mrs. Bentley said when she came into their office at Mexico, on the date above referred to, was, "I came up to see about closing that deal Mr. Fowles;" that witness' father then spoke up and said he was not ready today, he would like to have a few more days on it. Mrs. Bentley said she would not sign any written contract extending the time but stated that appellant could have an extension of time; that the time spoken of was ten days' time. Witness asked her for that time and said to Mrs. Bentley that they would like to have ten days further to see if they could handle this and that he (witness) had written on the back of the contract an extension clause to that effect and wished Mrs. Bentley would sign it; asked her to sign it. Mrs. Bentley said, "No, I won't sign it." She said she would not sign any statement giving any time but would grant further time. At first, said witness, she talked as though she would not give five minutes' extension and then went on and said she would give them a lifetime but she declined to make it definite. He says that they

first asked Mrs. Bentley for thirty days. Mrs. Bentley "didn't say she wouldn't give it, merely, when we would ask her for any time at all, she said she would not sign any statement giving us any extended period of time." 'She would merely make it oral. "I told her," said witness, "an oral statement with as many witnesses as we had there was as good as a written one; it made no difference whether she signed it or not," and she refused to sign any written agreement, did not say she would not give thirty days but when witness asked her for ten days' extension to be signed on the contract he couldn't get her to sign anything. When he wrote out the memorandum which he asked Mrs. Bentley to sign he did not put thirty days' extension in it but put ten days because he thought it would be easier to get ten days, but Mrs. Bentley would not sign that and would not sign any statement at all. This witness further stated that he dictated the extension on the back of the contract which he wished Mrs. Bentley to sign. (No form of extension appears on the certified copy of the contract as recorded which was put in evidence.)

The appellant put in evidence correspondence between Mr. Stocks his attorney, and Mrs. Bentley. A letter from Mrs. Stocks, dated March 27, 1907, addressed to Mrs. Bentley, at St. Louis, was a demand for the return of the $450, and a request to know whether Mrs. Bentley would consider a settlement of the claim without suit. Mrs. Bentley's answer to this, dated at St. Louis, March 29th, is a repudiation of any claim that appellant has against her. She further states in the letter that Mr. Fowles had contracted to buy the farm for $250 down and $200 in sixty days' time, that is December 26, 1903, and that on March 1st, she was to give him the deed and abstract and receive the balance and that she went to Mexico with everything prepared to give Mr. Fowles possession of the farm but he could not meet the obligation, so of course the farm reverted back to her but that she had

done more than any one else would have done, had given him ten days or a month more to dispose of the farm if he could; that the deal on his part was a risk and he lost; he thought he could sell before the last payment was due as there was a land boom at the time and she concludes with the statement that if any one should sue she thinks she is the one that should sue him and that she might do so; that there is not any settlement to be made by her and she thinks seriously of suing him.

The appellant himself testified to the signing of the contract between Roden, as agent for Mrs. Bentley, and himself, at Mexico, and to the fact that he had paid $450 to Mr. Roden as agent for Mrs. Bentley; that Mrs. Bentley came up to Mexico and met appellant and said she had come up to close up the land trade. Appellant told her it did not suit him to take it then; that he wanted further time and she agreed that they could have time. She talked about wanting to make a loan and about wanting to rent the land, and appellant said he didn't object to that; that she could go on and do that and, "I will keep on trying to sell the land." Mrs. Bentley said she would like appellant to sell it, wanted him to get his money out of it, didn't want him to lose anything; said to go ahead and sell it, but set no time. She refused to sign any written extension. Witness offered to pay her for an extension, told her at the time that $250 was due him on the contract and said to her that if she would sign an agreement to extend the contract he would say nothing about it but would lose it all if he failed to sell it in a reasonable time; doesn't remember that there was any time set but when Mrs. Bentley left the office she said that appellant could keep on trying until he could sell it; did not make the offer of forfeiting the $250 in consideration of an extension of ten days; does not remember to have seen the written form of extension which his son had written out at the time; doesn't

remember seeing it when it was put on the back of the contract; had no knowledge of its having been on there until afterwards, and had no agreement at any time with Mrs. Bentley for her to indorse a ten days' extension on the contract; that his understanding was that there was no limit mentioned as to how long he should have to undertake to sell the land; that Mrs. Bentley had never offered or tendered appellant an abstract or deed, nor had Mr. Roden for her. She had never offered to put him in possession of the land. Appellant was asked by counsel how much time he wanted to get from Mrs. Bentley when she was there. He said he wanted plenty of time, he wanted further time, and Mrs. Bentley gave him further time but no definite time, and after Mrs. Bentley left witness had put it in the hands of every agent in Mexico and tried to sell it himself but without success, had worked on it down to August, 1903, and even after Mrs. Bentley had sold it to Pumphrey, as he did not know of that sale until some time after it was made. Had not seen Mrs. Bentley after the third of March, 1903. She had never tendered him an abstract or deed, nor had anyone else ever done that for her, nor had she or any one for her ever made any demand on him for the completion of the contract, nor had she ever notified him she was going to terminate it. Had heard, about August, 1903, that Mrs. Bentley had sold the land. It appeared by statement of counsel at the trial, that Mrs. Bentley had given a warranty deed to one E. F. Pumphrey, of date August 21, 1903, which was filed for record February 29, 1904. The contract between Mrs. Bentley and appellant was filed for record the twenty-ninth day of August, 1903, and her counsel stated during the trial, as appears by the abstract, that the fact of the sale to Pumphrey and recording of the deed to him having come to his knowledge, was what caused him (appellant) to assert his claim and put his contract on record. Appellant further testified that he told Mrs.

Bentley that if she would sign an agreement to extend the time, that he would give her the $250 but that he had not offered the $250 or any other sum for an indefinite extension. On recross-examination witness testified that he did not claim that Mrs. Bentley had extended the time for a period of one year; there was not any definite time set; had gone to Mr. Roden after the third of March and said to him that he understood that he had sold the land and he (appellant) thought Roden ought to have given him notice and that Roden said he did not have anything to do with it but that Mrs. Bentley's son had sold it. Roden had not come to witness with a deed at the end of ten days after the time had expired under the contract, never had gone to Roden or Mrs. Bentley and offered to complete the deal; they had sold it out under him, as he testified.

On behalf of the respondent, Mr. Roden testified that Mrs. Bentley had come up to Mexico about the first of March, 1903, and that he went in company with her to see the appellant. They went to Mr. Fowles' office about the first of March. Mrs. Bentley said to Mr. Fowles that she had come up to close up the deal on the farm. Mrs. Bentley had with her the abstract and papers. Mr. Fowles said he was not ready to close the deal right then; it did not suit him to close it that day and he asked further time. Mrs. Bentley declined to give him further time and they talked quite awhile and Mrs. Bentley did finally agree to grant him ten days. There was no contract signed to that effect but it was verbally understood that he might have ten days longer. At the expiration of the ten days witness testifies he met Mr. Fowles at his office or close to that and asked him if he was ready to do anything with the Bentley matter, "ready to close up that Bentley matter, that the lady wanted her money." Appellant said it did not suit him to do anything right then. That, witness said, was his recollection of what took

place and that was at the end of ten or twelve days af-
ter Mrs. Bentley had been there. At that time appel-
lant made no offer. The land was ultimately sold
through some one else, and witness had nothing to do
with its sale. On cross-examination this witness re-
peated that Mrs. Bentley had verbally agreed to give
ten days further time to appellant and no more; that
was specifically understood at that time. Mrs. Bentley
did not agree to give appellant thirty days; she, at
first, did not want to give him any time but finally
did agree, before she left, to grant him ten days fur-
ther time, and that was all that was said on that sub-
ject. Has no recollection of Mr. Fowles afterward
meeting him and asking him why he sold that land,
might have met him, had no recollection of it but he
(witness) had never sold the land at all.

This was substantially all the testimony in the
case touching the making of the contract and claimed
extension of the time for its performance.

On the question of actual notice of the contract
between appellant and Mrs. Bentley, on the part of
Newberry and his grantors, Mr. Baker, an attorney,
testified that he was in the employ of the Mexico Land
& Loan Company the first part of July, 1903, and had
been with them until April of the following year; that
that was a corporation engaged in the business of buy-
ing, selling and trading real estate, and the people
managing it were W. M. Reynolds, E. F. Pumphrey
and J. L. Galloway; that this land referred to in the
contract was contracted for sale by this company to a
party in Iowa but he never carried out his part of the
contract and the company afterwards sold it to a Mr.
Sharp. Mrs. Bentley had deeded the land to Mr.
Pumphrey, who took the deed on the part of the com-
pany in his own name. The contract by which the
company or Pumphrey obtained it from Mrs. Bentley
was made in the latter part of July or the first part
of August, 1903, but the deed was not executed until

sometime afterwards. Witness had nothing to do with this trade with Mrs. Bentley. It was closed in behalf of the Mexico Land & Loan Company by Mr. Galloway, who closed it up with John Bentley, a son of Mrs. Mary Bentley, who came up from St. Louis and attended to ˙ the details for her.. Witness knew that appellant and his son were in the office of the Mexico Land & Loan Company and were trying to get that company to buy the land from them and they had the contract between appellant and Mrs. Bentley with them in the office of that company, and remembers that this contract was spoken of in the office of the company, and it was stated that it had expired and that the company could buy the land cheaper from Mrs. Bentley than from Fowles and they concluded that they would buy it direct from her. Appellant and his son were in the office of the company several times, anxious for the Mexico Land & Loan Company to handle the land for them. They were there about this matter both before and after the trade had been closed between the company and Mrs. Bentley. Witness remembers seeing the contract when appellant brought it to their office and it had a typewritten extension on the back of it which was not signed, and appellant Fowles showed them this unsigned extension. The Mexico Company had bargained the land to this Iowa man before they had bought it themselves. Messrs. Pumphrey, Reynolds and Galloway were all working in the office of the company, engaged in the same business. Mr. Reynolds was president of the company, Mr. Pumphrey treasurer and Mr. Galloway secretary, and the land was handled on account of the company in the name of Mr. Pumphrey.

Mr. Claud Fowles, the son of the appellant before referred to, testified to the effect that he and his father had made every effort to sell this land and that they had called it to the attention of the Mexico Land & Loan Company people and had talked with Messrs.

Galloway and Reynolds before they went into that company and after they had gone into it and had asked them to handle the land if they could, and he had notified Mr. Pumphrey that his father had a contract on the land and that. Mrs. Bentley had extended it and that they had not closed it up and that he and his father didn't know exactly when they would but they wanted to handle the land as soon as they could to get it closed out; he told Mr. Pumphrey this some time in June, 1903; had taken the contract up and given it to Mr. Baker and Mr. Baker and Mr. Pumphrey had stepped into a back room and looked it over and handed it back to witness. When he spoke to Mr. Pumphrey about the matter prior to Mrs. Bentley deeding it to Pumphrey, Pumphrey stated that his company might be able to handle it and if they did they would help appellant and his son out any way they could; that "they always hated to see a fellow fall down on a contract that way." Witness told Mr. Pumphrey that they (meaning appellant and witness) had a contract and that Mrs. Bentley had extended it after the first of March and that they had some time to sell it in; that Mrs. Bentley had not given them notice when she would close the contract with them but that they had a contract on the land and that it had been extended. On cross-examination this witness testified that he was acquainted with the respondent Newberry, that is, had merely met him.

The appellant testified as to conversations with the members of the Mexico Land & Loan Company, all of whom he knew, but could not remember what, if anything, he said to any of the firm about having the contract or being owner of the land, but was very positive that he talked to everybody, that is, to all of the real estate men in Mexico about his contract and about his having the land and that the contract had been extended.

J. E. Callahan, a witness for appellant, testified that he had lived on Mrs. Bentley's farm, the one described in the agreement, in 1903, and until the spring of 1904, when Mr. John Sharp moved on to the farm. This was the John M. Sharp, who purchased the land from Pumphrey. In the summer of 1904, in a conversation with Sharp, witness mentioned something to Sharp about appellant having purchased this land; doesn't know that he can say exactly what that conversation was but his recollection is that Sharp told him he wanted to sell the farm, and witness told him it was a hard place to dispose of, hard to sell; that "Mr. Fowles had bought it and couldn't sell it, couldn't turn it again, I think is the way I came to tell him." On cross-examination witness testified that Sharp, when talking to him about selling it, spoke of it as selling it for himself and that this conversation occurred after Sharp had bought it and was living on it.

The respondent Newberry, as a witness on his own behalf, testified that he had purchased the land in controversy, in October, 1905, from John M. Sharp; that at the time he bought and paid for the land he had no notice that appellant had any claim or contract whatever in regard to it and had not any such information until the twentieth of April, 1907, when he received a notice in writing from Mr. Stocks, an attorney for appellant, that appellant claimed to have bought the land; did not know anything about any written contract between appellant and Mrs. Bentley prior to that time; does not know of any verbal contract between them. After he heard from Mr. Stocks he made an investigation and found the written contract referred to on the deed records of the county. It was not on the abstract he had been given but after he found it of record and after the twentieth of April, 1907, he had it put on his abstract but it was not noted on the abstract before that time. He paid John M. Sharp the amount stated in the deed from Sharp to him

for the property. On cross-examination respondent Newberry testified that when he bought the land he had an abstract which was given to him by Frank Jesse, who had examined the abstract for him. A Mr. Crosby had attended to the business of obtaining the abstract and gave the abstract to Mr. Jesse.     Mr. Crosby was the gentleman who had acted as agent for Mr. Sharp when respondent bought from Sharp, and Crosby got the abstract, turned it over to Mr. Jesse and Mr. Jesse, who was attorney for witness, examined it for him. Witness did not instruct Mr. Jesse to go to the record; all he told him was to examine the abstract and that is all he did examine; never had any talk with Mr. Crosby about the title and had never had any talk with Mr. Sharp about the title until after he had received the letter from Mr. Stocks.

Mr. John M. Sharp, examined as a witness for respondents, testified that he had owned this land and had sold it to respondent Newberry; had bought the land in the latter part of September, 1903, taking possession the third of March, 1904, and had paid $2,000 when he made the contract on the place and had not paid any more on it, the rest of it being covered by the mortgage; had received the deed for it in 1904, had bought it from Reynolds, Pumphrey and Galloway. The deed was made to him by Pumphrey and money paid to him and at the time he bought the land from Pumphrey and at the time he paid for it, he did not have any knowledge of any contract between appellant and Mrs. Bentley in regard to the land. The first knowledge he had of any contract between appellant and Mrs. Bentley concerning this land was in 1904, when Mr. Callahan, his neighbor, was telling him about some man, but he did not say anything about the contract. He (Callahan) said that some man had bought the place and couldn't pay for it and didn't take it, or something like that; that was the first he heard of any one having had it before. Witness had the ab-

stract before referred to and had Mr. Jesse examine it, had turned the abstract over to Mr. Newberry. (The contract was not noted on the abstract.) He was given a deed to the land in 1904, and it was not right and a new deed was made to him for it. The deed which he finally received was from Pumphrey and wife to him, and is dated January 16, 1905, but he had received a deed before that from them in the spring of 1904. Had first traded for the land in 1903, along in September, and received a deed in the spring of 1904; that was the defective deed and he was given another in 1905; had paid the $2,000 when he received the first deed; had paid that to some member of the Mexico Land & Loan Company. In the conversation he had with Callahan, in which Callahan told him that appellant had bought the land, Callahan told witness that appellant had bargained for it, paid a little on it; couldn't raise the balance; lost the place or something like that. Callahan did not tell him anything about the contract. Respondents introduced in evidence deed from Mary Bentley and her husband to Pumphrey of date August 21, 1903, filed for record and recorded February 29, 1904, in which the description of the land was incorrect. They introduced a quitclaim deed from the same parties to Pumphrey, of date October 5, 1905, recorded November 4, 1905, containing a correct description and purporting to be a correction deed of the former one. They also offered in evidence a deed from Pumphrey and wife, of date January 16, 1905, recorded January 19, 1905, to John M. Sharp for the same land and a deed from John M. Sharp and wife to respondent Newberry of date October 31, 1905, recorded November 4, 1905, in which the consideration is recited as $5,450.

This is substantially all the evidence in the case.

In the amended petition of appellant, after setting out the contract in full and its record, it is averred that the record of the contract, notwithstanding the fact that the contract was not acknowledged, became, one

year after entry thereof, notice to all subsequent purchasers of the land of the contents and effect thereof, as provided by section 3118, Revised Statutes 1899, and appellant in his amended petition, pleads that section. Payment of the $450, in accordance with the contract, is averred, and it is averred that said sum so paid "became at the date thereof a lien in favor of plaintiff on and against said lands in the hands of the vendor and defendant herein Mary Bentley." It then avers a verbal agreement for an extension "in consideration of the adjustment and settlement of points of dispute in reference to their said contract as between them and that the extension should remain in force and effect for an indefinite period, and that by the extension the respondent, Mrs. Bentley, had waived her right to performance within a stipulated time and that the contract remained in force from and after March 1, 1903, until rescinded and repudiated by Mrs. Bentley. Non-compliance by Mrs. Bentley with the contract is averred, and that she had conveyed it in disregard of the contract to Pumphrey; that Newberry is the owner and in possession of the land and holds the same adverse to plaintiff's claim and lien for purchase money paid to Mrs. Bentley; that Newberry holds title and possession by deed of conveyance from one Sharp; that Sharp was the vendee of one Pumphrey, the vendee of Mrs. Bentley, and that Newberry is the purchaser of the land with full notice of plaintiff's claim and lien for purchase money so paid by plaintiff to Mrs. Bentley and that his title and possession is subject to the plaintiff's claim and title therefor, and avers nonpayment of the $450 to him and refusal to do so "to the damage of plaintiff, as he says, in the sum of $450. . . . Plaintiff prays judgment of and from the defendants in the sum of $450, with interest at the rate of six per cent per annum, from December 26, 1902, and that plaintiff's claim for purchase money so paid under and by virtue of the contract as found and ad-

judged herein to be and the same be declared a lien against the lands described in said contract; that the defendant B. L. Newberry holds said land with full notice of and subject to said lien; that said lien be foreclosed against said lands and that they be ordered sold to satisfy said lien and for other and such further relief as the court may find proper to enforce plaintiff's lien and for the costs of suit."

There appears to have been personal service on respondent Newberry in Audrain county, and on Mrs. Bentley, in St. Louis. The latter appeared for the purpose of the motion only, as is set out in the motion, and for the purpose of denying the jurisdiction of the court over her, and she moved to dismiss the action on the ground that she resides in and was served in the city of St. Louis and that the petition shows on its face that there was no joint liability between her and her codefendant. This motion was overruled, exceptions being duly saved, and on June 29th, the motion to dismiss having been overruled, this entry seems to have been made: "Defendant Bentley's motion to dismiss being submitted to the court is overruled and now defendant Bentley reserving the right to insist on want of jurisdiction, asks leave of the court to plead on or before August 1, 1907, which leave is by the court granted." Exceptions seem to have been duly taken to the action of the court on these matters and to have been preserved in the record. At the September term of the court answers were filed. Mrs. Bentley, in her answer, avers that she appeared under protest and in obedience to the order of the court and she again interposed, in and by her answer, her objection to the jurisdiction of the court; set up that at the time of service she was a citizen of the city of St. Louis and was served with process in that city and had never appeared to the action except for the purpose of ques-

135 App—28

tioning the jurisdiction of the court, and avers that there is no joint cause of action stated against her and her co-defendant Newberry, and she pleads to the jurisdiction of the court both over her person and the subject-matter of the suit. She avers non-performance of the contract on the part of appellant, denied the extension and avers the sale of the property to Pumphrey and from Pumphrey to Newberry by mesne conveyance, and denies every allegation in the petition. The respondent Newberry in his answer also challenges the jurisdiction of the court and avers he is a purchaser for value and without notice of knowledge of the contract, or any extension thereof between appellant and Mrs. Bentley. The abstract of the record recites that the court, at the conclusion of the hearing and arguments, "entered the following minutes on the docket." This entry is then set out as if a part of record proper, but not as being in the bill of exception. In effect the conclusion of the court, as set out in the docket memorandum is carried into the judgment, by which the court while awarding judgment in favor of Newberry on the merits finds the issues "on the special plea of defendant Bentley to the jurisdiction of the court in her answer in favor of said defendant, Mary Bentley."

REYNOLDS, P. J. (after stating the facts).—The minutes of the judge on his docket, or endorsed on the wrapper or files, are no part of the record proper and can only be considered if made into the record by the bill of exceptions. The whole judgment, however, is before us, and it substantially sets out the finding.

The learned counsel for appellant, in a very elaborate brief and argument, as well as in the amended petition in the case, have invoked the provisions of section 3118, Revised Statutes 1899, in support of the effect, as constructive notice, of the record of the con-

tract between appellant and Mrs. Bentley, claiming
that under this section it did import constructive no-
tice to the respondent Newberry of that contract. This
contract, as recorded, was not acknowledged by any of
the parties to it. The record of it could only con-
stitute constructive notice, under the general law, if
it was an instrument entitled to be recorded. This is
admitted by counsel. But it is claimed that notwith-
standing this, its record imported constructive notice by
virtue of the above section. It is also very frankly
admitted by them that the decision of the Supreme
Court of this State in the case of Williams v. Butter-
field, 182 Mo. 181, is against their contention and an
earnest argument is made to us against that decision,
and we are asked to disregard it. We are precluded
from doing this, as we are conclusively bound by it.
In this Williams case, *supra,* our Supreme Court has
distinctly held that the term "such instrument," as
used in section 3118, means only such instruments of
the class mentioned in the former clause, as shall have
been so recorded for the period of one year prior to
the enactment of the section; that is prior to 1887. We
are therefore bound to hold that the record of
the unacknowledged contract did not import construct-
ive notice to any one. As there is no evidence what-
ever, even tending to show that the respondent New-
berry had any actual notice or knowledge of the con-
tract between appellant and Mrs. Bentley, no lien what-
ever could be fixed upon the land conveyed to him by
her, and the action as against him and as against the
land in his ownership, must fail. The testimony is
so unsatisfactory and unconvincing as to Sharp, the
grantor of Newberry, having had any actual notice of
this contract, that we might even be warranted in de-
clining to hold the land in Newberry's hands charged
with any lien, for the reason that there is lack of no-
tice to Sharp of the lien. Newberry would have a per-
fect right, even if he had himself had knowledge of the

agreement, to have protected himself by the lack. of knowledge or notice on the part of his grantor. It appears that the Mexico Land and Loan Company, and its officers did have notice of this contract, but that notice is not carried forward to Sharp by any clear testimony and most certainly is not carried on to Newberry. Neither Pumphrey nor his partners are parties to this suit, or now interested in the land, nor had they or Sharp any interest in it when this suit was instituted.

It is claimed, however, that the court, even after refusing to establish a lien on the lands in the hands of Newberry, should have gone on and awarded judgment as against the respondent Mrs. Bentley for the $450 which she had received from appellant, and we are further asked to set aside the finding and decree in this case and to render one in accordance with the weight of the evidence and establish that claim as a lien against the land. We have carefully considered all the evidence in the case and have arrived at the conclusion that the appellant has made out no case for relief in a court of equity against either of the defendants, the respondents here.

As the record of the contract carried no constructive notice, and as it is beyond question that respondent Newberry had no actual notice of it, all shadow of claim to a lien on the land in his hands disappeared. Counsel for appellant has collated a multitude of cases in support of the proposition that when a court of equity once acquires jurisdiction it will go on and administer complete justice between the parties over the subject-matter in issue between them—will even adjudge damages and enforce payment. That is very true, but it only does so, in support of and under and in furtherance of its chancery jurisdiction, and to enforce an equitable right, and when the money demand arises under such circumstances as bring it within the equity jurisdiction of the court. It cannot usurp the

functions of a court of law. It can, in aid of its decrees as a court of chancery, and to administer complete equity, use powers that ordinarily pertain to the courts of law. But it must do so in the execution of its chancery powers and must be proceeding under a cause within its jurisdiction as a court of chancery. In this case then, reviewing all the evidence, we do not think plaintiff has proven any equitable right to the recovery of this money or to have it charged as an equitable claim against Mrs. Bentley. She did not grant any extension, even verbally, beyond ten days. If it is claimed that plaintiff was entitled to a judgment for this $450 by way of damages, then we must not forget that this is a suit in equity, and that while, under our code, the distinction between the forms of pleading in cases at law and in equity has disappeared, the distinction between legal and equitable causes, and the principles governing them are as well preserved and sharply defined as before the adoption of the code. [See Maguire v. Tyler et al., 47 Mo. 115.]

The very earnest contention of counsel for appellant, that even if the lien failed, a money judgment should have been rendered against Mrs. Bentley for the amount paid her by appellant, cannot, therefore, be sustained, not for the reason claimed by her counsel and embodied in the judgment by the court, that her plea to the jurisdiction over her, as set up in her answer was a good plea, but because, on a review of all the testimony, we do not think plaintiff has established any equitable right to this money as against Mrs. Bentley. In this view of the case, it is immaterial to consider or pass on the question as to whether the plea of Mrs. Bentley to the jurisdiction of the court by reason of service on her outside of the county of the court, set up both by motion and in her answer, should have been sustained, or the other question as to whether, by her pleading over and answering, she lost the benefit of that plea. On these propositions we express no

opinion.  In our opinion the judgment of the lower court, in that it found for both ' defendants and dismissed the case is correct and its judgment is in that respect and to that extent affirmed.  All concur.