**Dorothy RUSSELL, Appellant,**

v.

**Bob Dee CASEBOLT and Vallie Marie White, Respondents.**

**No. 49716.**

Supreme Court of Missouri,

Division No. 2.

Dec. 14, 1964.

Edward L. Simmons and Simmons & Buford, Kansas City, for appellant.

Brown, Douglas & Brown, R. A. Brown, St. Joseph, for respondent Vallie Marie White.

Vernon N. Kneib, St. Joseph, for respondent Bob Dee Casebolt.

EAGER, Judge.

This is, or was, a suit for personal injuries, and it suffered a very unusual ending. At the conclusion of all the evidence, and on June 28, 1962, the Court overruled an oral motion of one defendant to dismiss, and sustained the motion of the other defendant for a mistrial, resetting the case. On July 10, 1962, the Court reconsidered the motion to dismiss, sustained it, and dismissed plaintiff's petition with prejudice. The stated grounds were: " * * * because plaintiff testified in this Court that her prior inconsistent statements given under oath by deposition were untrue and that she knew such statements to be false at the time she made them; The Court further finds that the admitted false statements did pertain directly to the material facts and issues to be determined in this cause, and plaintiff's explanation that she was instructed by her former lawyer to give untrue testimony, whether true or false, does not justify this Court in condoning admitted perjury referring to the factual issues to be determined; * * *." In other words, the Court entered a final judgment of dismissal with prejudice, after a mistrial had been granted for other reasons, because it found that plaintiff had committed perjury. Plaintiff has appealed. This presents a somewhat novel question of procedure.

We shall not need to state the facts in great detail, for we do not propose to determine anew whether plaintiff did or did not commit perjury. Plaintiff, a married woman in her late forties with ten children, worked at a food processing plant in St. Joseph, and lived in a small town east of St. Joseph. She obviously had little education. On November 2, 1960, she and two women co-workers were headed east on Highway 36 about eight or ten miles east of St. Joseph. A Mrs. White was driving and owned the car. The passenger in the center of the front seat was Bessie Myrick (now McClung). Either on, or

just west of a bridge known as the Third Fork Bridge, they collided in more or less of a glancing impact with a car being driven west by the defendant Bob Dee Casebolt. After the original collision Mrs. White's car struck a portion of the bridge. Plaintiff received very substantial injuries, which we shall not need to detail. Mrs. Myrick was also injured. The plaintiff employed Mr. Ralph Hulse of St. Joseph to file suit for her against Casebolt. While plaintiff was in the hospital in St. Joseph Mr. Hulse procured (through another lawyer) a statement from her on behalf of Mrs. White's insurer and later, according to his testimony, Hulse told plaintiff upon her request that he could represent her if she was making no claim that his insured, Mrs. White, was at fault. Mrs. McClung also had Mr. Hulse file suit for her, against Casebolt alone. After depositions were taken both plaintiff and Mrs. McClung, supposedly having been told by a lawyer that there was a conflict of interests, discharged Mr. Hulse, employed new counsel, and filed new suits in Daviess County against both Casebolt and Mrs. White. The present trial was of one of those suits. Depositions had also been taken in the new suits. By the time plaintiff's case went to trial she had given a signed statement and two depositions.

At the trial various inconsistencies developed in the testimony both as between different witnesses and in plaintiff's own testimony. The principal claims of negligence against Casebolt were that he was operating his car partially on the wrong (south) side of the road, and that he was driving too fast. The claims against Mrs. White were that she failed to swerve or slacken her speed, and also that she drove partially on the wrong side of the road. Plaintiff's counsel not only produced the plaintiff as a witness in her own behalf, but also Mrs. McClung, Mrs. White and Casebolt. Mrs. White testified: that she was traveling 45 to 50 miles an hour, entirely on her own side of the road at all times, and that, at the time of the collision,

the two left wheels of Casebolt's car were on her side of the road; that the collision occurred on the bridge; that she first saw Casebolt's car when she was west of the bridge and that Casebolt was then just coming on the bridge. Mrs. McClung testified: that Casebolt, when east of the bridge, seemed to be moving back and forth between his own lane and the south lane; that she first saw him when each car was perhaps 400 feet from the bridge; that there were cars in between them; that Mrs. White was near the center line, but she did not know just where her car was at the time of the collision; that she (McClung) yelled just before the collision that "We are going to hit"; that she felt no braking of the car and that she could not say whether Mrs. White swerved. This witness was cross-examined strenuously from her statement and depositions, and substantial inconsistencies developed. She had previously said that Casebolt straightened up about the time he came on the bridge and then seemed to cut across the road and never swung back. Mr. Casebolt testified that the collision occurred about 100 feet west of the bridge and that his car was entirely on its own side; that he was probably traveling 60 miles an hour; that immediately prior to the collision he had glanced down at the instrument panel and when he looked up the other car was in front of him. The necessary inference from his testimony was that the other car had angled over on his side. Shortly before the accident, Casebolt had been arrested by the Highway Patrol for driving at 77 miles an hour and he was later convicted of that offense.

Plaintiff's testimony developed numerous inconsistencies. On direct examination she testified briefly that she saw a car on the other side of the bridge which swerved back and forth a time or two; that she did not pay much attention to it until her companion yelled: "We are going to get hit"; that she was on the right side and was not looking at the road; that she was knocked unconscious; that she heard no

horn and does not know whether their car swerved. On cross-examination she testified: that each car was about a quarter of a mile from the bridge when she first saw Casebolt's car; that she did not know where either car was with reference to the center line at the time of the collision; later, that she was not positive about the distances; that once or twice she saw Casebolt get on the south side; that she did not know Mrs. White's speed, although she had previously said it was "about 45"; she admitted that she testified to other distances in her deposition, and that she had said that when she saw Casebolt the second time "pretty close to where he hit us" he was clear over on our side of the road; at the trial she testified that she did see him cross the center line. Finally, the following occurred: "Q The next question (referring to the deposition) was, 'Was the Casebolt car on the bridge at that time?' Answer, 'Yes, it was.' A. I dont know whether it was or not. Q. You have testified to it? A. Sure I did, but I lied. Q. You dont know where the Casebolt car was now? A. I dont know. Q. Why did you say it was on the bridge? A. Because you probably had me all mixed up." At one point plaintiff testified that at the first deposition "We said just what Mr. Hulse told us to * * *." Mr. Hulse testified in considerable detail and specifically denied that he told plaintiff to say anything except to tell the truth.

It is impracticable here to go into all the intricacies of this cross-examination or to discuss the theories of negligence or non-negligence argued in Respondent White's brief. It will be sufficient to quote the summary of plaintiff's evidence as made by Mrs. White's counsel on pages 27–28 of their brief as follows: "Russell first had White going at an unknown speed and then had her going 45 miles an hour. She had the two cars, when they first saw each other, a half a mile apart, and then only a 100 to 200 feet apart. She never saw Casebolt come over the center line and then she did see him come over the center line.

She had White doing everything she could to protect herself and then she wasn't. She had White on the south of the center line at all times and then she didn't know where she was. She had the collision first at one point and then at another. These contradictions were never explained." Then counsel adds: "In the final analysis, they were not only so glaring as to conclusively show that Russell testified untruthfully, but she even admitted that she had lied and lied under oath."

Robert H. Wright, who was riding with Casebolt, testified corroborating the defense that Casebolt was on his own side of the road, and that Mrs. White crossed over to the wrong side. We have related all this seemingly unnecessary detail simply to furnish some background for the subsequent trial proceedings and for our ruling.

At the close of the evidence counsel for Mrs. White made an extended oral motion to dismiss the case as to both defendants, on the ground that plaintiff had admitted perjury, that she was in Court with "unclean hands," that she was engaged in an unlawful and criminal proceeding, and that the Court should not aid her. There was no motion for a directed verdict. The motion to dismiss was overruled. The Court then proceeded to reconsider its ruling on a prior motion for a mistrial made by Casebolt's counsel on account of prejudicial evidence showing that Casebolt's insurer had made settlement offers to plaintiff, Mrs. White and Mrs. McClung (apparently jointly) and that there was a dispute as to "who was entitled to how much." The Court had previously ordered that testimony stricken and had instructed the jury to disregard it. Upon reconsideration of the motion, however, a mistrial was declared, the jury was discharged, and the case reset for a future date.

Twelve days later the Court reconsidered and sustained the motion to dismiss and dismissed plaintiff's petition with prejudice upon the ground that plaintiff had knowingly and admittedly made false statements

under oath as to material matters by deposition. That order constituted a final judgment.

The Points of the plaintiff-appellant are, in essence: (1) that the action of the Court was without authority or precedent and violated plaintiff's constitutional right to a jury trial; (2) that there could be no "perjury" without a conviction or a plea of guilty, since perjury is a crime; (3) that plaintiff did not, in fact, lie; (4) that there was no change of any material fact or material change in testimony; and (5) that defendant White had waived all right to object by not making timely objections or asking that the case be dismissed while the evidence was being heard.

In order to put the matter in its proper perspective, we also note here the Respondent White's Points. They are: that the Court's action was proper because (a) the doctrine of "unclean hands" was applicable; (b) the doctrine of equitable estoppel was also applicable; and (c) the glaring inconsistencies in plaintiff's testimony precluded reliance thereon. The other points go merely to negative the like points of plaintiff.

Supplemental memorandum briefs were requested and filed, supposedly to assist in solving the procedural problem involved. However, we are cited to no case where similar action or even analogous action has been taken.

We repeat here that we shall not attempt to determine anew whether plaintiff committed perjury. She was guilty of many contradictions and inconsistencies; we frequently see somewhat similar situations, perhaps not so exaggerated. Her statement that she had "lied" was unusual, to say the least. We might conjecture that she merely meant that she was mistaken, except for the fact that she sought to lay the blame for some of the contradictions upon her former attorney. One pertinent feature is that after Mrs. White was added as a party, certain of the evidentiary requisites to liability were changed. Some of the matters complained of now consisted obviously of con-

fusion,—confusion about distances, the exact positions of cars, etc. Some of the differences in plaintiff's testimony may have been intentional and simply false. An extremely conscientious trial judge felt that they were. We do not reverse him on his findings, but we do find the procedure followed to be improper.

The motions provided for in our Code of Civil Procedure, § 509.290, are intended to dispose of actions which are "groundless on the uncontroverted facts," Burke v. City of St. Louis, Mo., 349 S.W.2d 930, 932, and they do not operate to "raise an issue involving a real controversy over a vital fact issue concerning the merits of a plaintiff's claim." Burke, supra; Pogue v. Smallen, Mo., 285 S.W.2d 915, 917; Roberts v. Epicure Foods Co., Mo., 330 S.W.2d 837, 840. Certainly, the grounds upon which this action was dismissed were based upon "allegations of facts which controvert the merits of the claim of the plaintiff." Pogue, supra.

■ We do not hold that a court may not sustain a motion for a directed verdict (or an after-trial motion based thereon, Rule 72.02, V.A.M.R.) where the plaintiff's claim rests solely upon his or her testimony and that testimony is so obviously perjured or so contradictory "as to preclude reliance thereon," Boehm v. St. Louis Public Service Co., Mo., 368 S.W.2d 361, 364, although such action would be unusual. See also: Crandall v. McGilvray, Mo., 270 S.W.2d 793, 800; Foerstel v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 792. In such event, however, the verdict would be directed because there was no substantial evidence upon which a jury might rely, and hence nothing to justify a submission. Such is not our case. There was other evidence here, and there was no motion for a directed verdict. So also, we have a Rule, 78.01, which permits the granting of a new trial for perjury which occasions an improper verdict. We have no such situation here, for there was no verdict. And we should note the rather extended discussion of that subject in the case of Loveless v. Locke Distribut-

ing Co., Mo., 313 S.W.2d 24, upon facts somewhat analogous to ours. There the Court concluded: that ordinarily the contradictions and inconsistencies of a witness go only to his credibility and do not destroy his testimony; that estimates and opinions are generally not binding; and that where the prior contradictory evidence is introduced the jury has full opportunity to evaluate the evidence. We again recognize that in the present case there was probably more reason for a finding of perjury, but we also repeat that the real problem here is one of procedure.

■■ We hold that the trial court, conscientious though it undoubtedly was, was without authority to dismiss the action with prejudice for the stated reason that the plaintiff was guilty of perjury. We have not excluded the possibility of a directed verdict, although it would seem that there was other evidence sufficient for a submission, even if all of plaintiff's testimony were disregarded. We are not impressed with the argument that the order and judgment should be upheld on the doctrine of "unclean hands." That is, as stated, an equitable doctrine and it is doubtful that the Missouri Courts have ever applied it at law. The cited case of Aetna Casualty & Surety Co. v. Lindell Trust Co., Mo.App., 348 S.W. 2d 558, is wholly inapplicable on its facts; it merely states that there is now "but one form of action." That is true, but as pointed out in Kesinger v. Burtrum, Mo.App., 295 S.W.2d 605, and Fowles v. Bentley, 135 Mo. App. 417, 115 S.W. 1090, although the distinction in the forms of pleading has disappeared under our Code, the distinctions between legal and equitable causes of action and in the principles governing each, have not been abolished but are preserved and are sharply defined. The cited case of Hotel Phillips, Inc. v. Journeyman Barbers, etc. (D.C.Mo.), 195 F.Supp. 664, recognized the principle in a suit under the Sherman Anti-Trust Act where plaintiff had accepted the fruits of the supposed price fixing. The case was either wholly or partially in equity, for injunctive relief was sought. The case

of Ogden v. Auer, Mo., 184 S.W. 72, also cited, was in equity and it was expressly so stated. In the case of Avery v. Central Bank of Kansas City, 221 Mo. 71, 119 S.W. 1106, the Court did, as suggested, make the statement that it was against public policy to fritter away the time of the courts in indemnifying those who suffered loss "by reason of violation of law." However, the basic holding was that there is no rule of law requiring contribution between wrongdoers or tort feasors; the case involved various ramifications of a bank liquidation, and it would seem that it was predominantly an equity case. We do not consider the case of Slocum v. Slocum, 37 Misc. 143, 74 N.Y. S. 447 (a suit for annulment with a counterclaim for divorce) as at all persuasive. We find no justification in Missouri law for applying the equitable doctrine of "unclean hands" to enforce the dismissal of an action at law for personal injuries upon the grounds stated here. The inapplicability of the doctrine generally in cases at law is discussed in Birk v. Jackson, Tex.Civ.App., 75 S.W.2d 918. We do not preclude the possibility of a dismissal upon the theory that the very inherent nature of a case is illegal and against public policy.

There are other and independent remedies for relief against perjury,—if and when it is found or suspected. The witness may be cited for contempt and a hearing held, with appropriate punishment if justified; or, the matter may be referred to the prosecuting attorney of the county for appropriate criminal action, if that is found to be justified.

■ Counsel also suggest that plaintiff's action should have been barred upon the theory of equitable estoppel. While that doctrine is often recognized at law, we are cited to no instance where it has ever been applied in a situation even faintly analogous to this one, and we hold that the action of the trial court was not justified on that theory.

■ We have already discussed those situations where contradictions and incon-

sistencies are such as to deprive a witness' testimony of all probative force (Respondents' Point 1C). If that contention was to be made, it should have been raised by a motion for a directed verdict. In Respondents' Supplemental Memorandum counsel argue that the Court, under Rule 75.01, retains control over all judgments for a thirty-day period after their entry and may "vacate, reopen, correct, amend or modify" its judgment. To that end they cite several cases. The principle is well recognized and it is unnecessary to discuss the cases so cited. Counsel also discuss whether this was a final or an interlocutory order; in that connection we suppose that they are referring to the original order overruling the oral motion to dismiss at the close of the evidence. Certainly that order was not a final judgment, and the case stood entirely undisposed of; when the mistrial was granted, the order merely disposed of *that trial*, and not the case. After granting a mistrial and discharging the jury the Court could not possibly, as a practical matter, reverse, vacate or modify that order, for the jury was gone and that trial was over.

The first judgment entered in this case was the order of July 10, 1962, dismissing the case with prejudice. There was never any attempt to vacate or modify this, the only judgment ever entered. Counsel say (citing cases) that it is immaterial whether the original order overruling the motion was an interlocutory order or a final judgment, for in either event the Court could vacate or modify it within thirty days. While the Court may have had, theoretically at least, the power to reconsider its order within thirty days,—we hold that it did not have, either at the original date or later, the power and authority to dismiss the case with prejudice and thus to enter a final judgment, for the causes stated. Our procedure simply does not permit it. Thus, the power to vacate or modify is wholly immaterial.

The defendant Casebolt has not been represented on this appeal. He was present in person and by counsel at the trial and, indeed, it was upon his counsel's motion that the mistrial was granted. The order and judgment dismissing the petition with prejudice constituted a disposition of the case as to all parties, and it was final unless and until reversed. Casebolt's absence here in no way impairs our jurisdiction to dispose of the appeal. If that were not true, any appeal could be frustrated by the failure of a respondent to appear.

The order and judgment dismissing plaintiff's petition with prejudice is reversed, and the cause is remanded for further proceedings consistent with this opinion.

All of the Judges concur.