REDMOND W. McBRIDE, Appellant, v. MERCANTILE-COMMERCE BANK & TRUST COMPANY.

MARY BELLE HACKMANN, Appellant, v. MERCANTILE-COMMERCE BANK & TRUST COMPANY.—48 S. W. (2d) 922.

Court en Banc, April 12, 1932.*

*NOTE: Opinion filed at October Term, 1931, March 15, 1932; motion for rehearing filed; motion overruled at April Term, April 12, 1932.

260

*Leahy, Saunders & Walther, John S. Leahy, William O. Herin* and *Lyon Anderson* for appellants.

*Thompson, Mitchell, Thompson & Young, Guy A. Thompson* and *Richard C. Coburn* for respondent.

264

WHITE, J.—Each of these cases is in replevin. They were argued and submitted together. In the McBride case the plaintiff seeks to recover possession of bonds and other securities valued at $491,071.88. In the Hackmann case the plaintiff seeks to recover bonds and other securities of the value of $444,940.

These securities were held in possession by the defendant as executor of the last will of Thomas Halpin, who died December 10, 1929.

The plaintiffs were his stepchildren and claim title to the property sued for each by gift *causa mortis* from Halpin.

One James McBride, father of plaintiffs, operated two drug stores in rented buildings in the city of St. Louis. He died in 1873, leaving three children, Redmond McBride, five years of age, and Mary Belle McBride and Joseph McBride, who were younger. Thomas Halpin, since 1870, had been a clerk in one of McBride's drug stores. He had been educated for a physician. In 1877 he married Margaret McBride, the widow of Thomas McBride and mother of the plaintiffs. He thereafter conducted the drug business with such success that at the time of his death in 1929 he left an estate, it was said, of two million dollars in value. Appellants say that it was a condition of the marriage that Thomas Halpin should adopt his wife's children. No adoption papers were introduced in evidence. One child was born of that marriage, James Halpin, who died in 1915. After the marriage Halpin treated the McBride children as his own. The relations between them, as stated by both sides to the controversy, were of the closest and most intimate affection. He called them "son" and "daughter," and they called him "father," and there was nothing to distinguish them as other than his own children. Mary Belle was married to Hackmann in 1897. At the time of the trial she had two children, both grown. Redmond McBride was married in 1904, and at the time of the trial he had three children.

The property claimed in his suit by Redmond McBride was in a safety deposit box with the Mercantile Trust Company and the

property claimed by Mrs. Hackmann was in a safety deposit box with the Mississippi Valley Trust Company. In 1897 he had rented a box with the Mississippi Valley Trust Company, and in 1906 he took another box and gave his son James access to it. That arrangement continued until James died in 1915. Soon after that he made arrangement by which he gave joint access to that box to Mary Belle Hackmann. That continued until 1926, when he discontinued that box and took another in his sole name, and so continued it until his death. He rented a box in the Mercantile Trust Company in 1905, in his name and in the name of his sister of whose business he had charge. She died in 1909. In 1912 he placed that box in the name of Thomas Halpin, or Mary Belle Hackmann, or Redmond McBride. It remained that way until October, 1926. From that time until his death it was in his name alone. It was stated by Redmond McBride in his testimony that in 1916 Mr. Halpin was seriously ill with pneumonia and he called Redmond to him and gave him a paper designated as Exhibit 7. It was written on a prescription blank of Dr. Kier. The written part was as follows:

"1-1-17.

"To Mary Belle Hackmann and R. W. McBride
"The box in Mercantile Trust Co. Vaults
"The box in Mississippi Valley Trust Co.
"Jointly hold. Railroad. Municipal,
"State and Co. Securities _____ $377,000
"Real Estate Notes _____ 65,000

                                                  _____
                                                  $442,000"

The witness said Halpin told him that he wanted him and Mrs. Hackmann to have those securities in event he died. He recovered. In May, 1923, he made a will in which he made several specific legacies and devised the residue of his property to the Mercantile Trust Company to hold and manage during the lifetime of Redmond McBride and of Mary Belle Hackmann; to pay McBride monthly $350, and Mary Belle Hackmann $400 monthly, the trust to terminate at the death of McBride and Mary Belle Hackmann. In 1925 he made a second will revoking the first, making sundry legacies as in the first with the same provision as to monthly payments to Redmond McBride and Mary Belle Hackmann, the trust to terminate at the end of ten years, then the *corpus* to vest in equal shares in McBride and Mary Belle Hackmann. In 1927 he made a third will revoking former wills, making similar specific bequests with the same trust to continue for a period of ten years with a monthly payment of $750 each to McBride and Mrs. Hackmann, and $35 a month to Joe McBride. The trustee was directed at

the end of ten years to pay over to Redmond McBride and Mary Belle Hackmann, or in case of their death to their children *per stirpes* in equal shares the remainder of the estate.

The evidence for plaintiffs tends to show the following:

Thomas Halpin had been in ill health for some time at the hospital suffering with cancer and knew he could not recover. He was returned to his home November 12, 1929, and died December 10, 1929. During his last illness Mary Belle Hackmann and Redmond McBride visited him daily. About the 15th of November while they were present, George Linde, a furniture dealer, came to the house and into the room where Halpin was to take measurements for a mattress for the bed on which Halpin lay. At that time Margaret Hogan, who had been in service in the family at intervals for many years, happened to be present. Katie Loftis, the housekeeper, came into the room and asked the sick man for money with which to pay a butcher's bill. He reached for his trousers to get the money and in taking the money from his pocket he drew out two keys, one a key to a safety deposit box in the Mercantile Trust Company, which he gave to Redmond telling him that the contents of the safety deposit box were for him and the other a key to a safety deposit box in the Mississippi Valley Trust Company which he gave to Mrs. Hackmann telling her the contents were for her. Each of the five persons present testified and were cross-examined at length upon this incident, as to just the language used by Thomas Halpin at that time. The testimony as to the expressions used varied with the different witnesses on direct and on cross-examination. These different expressions will be noticed more fully in determining the sufficiency of the proof.

The plaintiff relies entirely upon what was said and done at that time in order to establish a gift *causa mortis*. It was shown that Halpin knew he was going to die, stated the time was not far off and that he could not recover. No testimony was offered by the defendant as to what actually took place at that time but it contends that the evidence was insufficient to make out a prima-facie case of a gift *causa mortis;* that it lacked the clearness and cogency which is necessary to convince a court that such a gift was intended and was actually made at the time.

Immediately after Halpin's death both the keys to the safety deposit boxes were delivered to the defendants by Redmond McBride. The last will was probated in December, 1929, and the defendant, as executor, made an inventory of the contents of the two safety deposit boxes and was in possession at the time the suit was brought.

In March, 1930, some attorneys who claimed to represent collateral relatives of Thomas Halpin filed a suit to contest the will of Halpin.

It is stated by respondent that the will contest was pending at the time of the trial of these cases. Counsel both for appellants and for respondents represented the estate in defense of that suit.

October 24, 1930, three months before these suits were filed, Mary Belle Hackmann signed a written statement giving account of what occurred in November, 1929, at the bedside of Halpin, when the keys of the safe-deposit boxes were said to have been delivered. To this statement were appended the signatures of Katie Loftis, Redmond McBride, George Linde, and Margaret Hogan, stating that their recollection of what occurred at that date concurs with the statements made by Mary Belle Hackmann. This paper was signed for the purpose of presenting to the defendant in making demand for the property. The depositions of these witnesses were taken and were introduced in evidence by respondent for the purpose of showing variation from what was said at the trial. The plaintiffs were present at the opening of the boxes at the time the witnesses made the inventory of the assets, and made no claim to the property which they later sued for.

The court then rendered judgment for the defendant in each case and the plaintiffs appealed.

The appellants assign error to the failure of the court to find the facts and determine the issues in dispute, contending also that there was no direct contradiction of the testimony of plaintiffs' witnesses, that the plaintiffs conclusively proved in each case a valid gift *causa mortis*. The defendant claims that the finding of facts was sufficiently specific to meet the requirements of the statute and that the proof upon which the plaintiffs rely to establish in each case a gift *causa mortis* was insufficient to establish such a gift with that convincing cogency which the law requires.

I. Respondent asserts that the defendant in each case was sued in its individual capacity while it had qualified as executor and held the property in its representative capacity, and, therefore, on this technical ground the plaintiff should not recover.

The respondent is not in position to urge that point. No such objection was made or passed upon in the trial court. In each case the defendant answered in its individual capacity, set up all the facts constituting its defense and its claim to the property, the possession of which it admitted. The point was never made in the trial court that there was a defect of parties defendant. Under Section 770, Revised Statutes 1929, a defendant may demur on account of defect of parties if it appears upon the face of the petition, if not it may raise the question by answer under Section 774. Otherwise the objection is waived.

II. Before considering the errors assigned we take up the claim of the respondent that the case was not made out "by the high standard of proof necessary in a gift *causa mortis.*" It is conceded that a symbolical delivery was sufficient without manual delivery of the gift. We must examine the evidence as to what was said and done on or about November 15, 1929, at the time the gifts were claimed to have been made.

Respondent relies upon Foley v. Harrison, 233 Mo. 460, 136 S. W. 354, and the doctrine laid down there.

While Mrs. Hackmann, Mr. McBride, George Linde and Maggie Hogan were there, Katie Loftis, housekeeper, who had been with the family since the birth of plaintiffs, came in and asked Mr. Halpin for some money to pay the butcher. Mr. Halpin reached for his trousers on a chair near his bed, took out some money, handed it to her, and in drawing the money from his pocket he drew out two keys, handed one to Mrs. Hackmann and one to Mr. McBride. Each of these five persons testified to what occurred and were not directly disputed. Mrs. Hackmann's testimony was taken in the case with the understanding that it could be used only in her brother's case; she was incompetent to testify in her own case because of the death of the other party to the contract sued on. Mr. McBride's evidence was taken with the same understanding, that for the same reason it could be used only in Mrs. Hackmann's case and could not be used in his case.

Maggie Hogan testified:

"Mr. Halpin then handed Mr. McBride a key and said: 'Here, Red, is the key to my box at the Mercantile Trust Company and the contents are for you.' and then handed the other key to Mrs. Hackmann and said: 'Mary Belle, this is the key to my box at the Mississippi Valley Trust Company and the contents are yours.'"

On cross-examination she said his statement was:

"'Here, Red, is the key to my box at the Mercantile Trust Company and the contents are *all* for you.'"

This was at the trial in June, 1931. Mrs. Hackmann had made a written statement in Mr. Leahy's office concerning the matter October 24, 1930. That statement was offered in evidence and marked "Exhibit 5."

Mrs. Hogan, with Katie Loftis, and Redmond McBride with George C. Linde, signed this verification of the statement:

"We, the undersigned, have read the above declaration of Mrs. Mary Belle Hackmann and attest that our recollection concurs exactly with the statements above made by her."

It describes the incident and gives Mr. Halpin's statement thus, addressing Redmond McBride:

"Red, this is the key to my box at the Mercantile Trust Company. I give you all of its contents."

In another statement made by Miss Hogan, October 31, 1930, in Mr. Leahy's office, she put what Halpin said this way:

"Red, this is the key to my box at the Mercantile Trust Company. I give you the contents of this box."

In Exhibit 5, also was this, when Mr. Halpin addressed Mrs. Hackmann:

"Mary Belle, this is the key to the box at the Mississippi Trust Company. All the contents of that I give you."

And in a statement made by the witness October 31, 1930, she put it this way:

"Mary Belle, this is my key to the box at the Mississippi Valley Trust Company and the contents of it are for you."

George Linde explained the incident in this way:

"He says, 'Here, Red' or 'Redmond,' I think it was 'Red,' 'here is the key to the Mercantile Trust Company,' and as well as I remember the expression, after giving him the key, he says, 'The contents of this box is all for you' or 'for you.' And then he turned to Mrs. Hackmann and gave her another key and says, 'This is the key to the Mississippi Valley Trust Company, and it belongs to you' or 'the contents of it is for you.' There might be a little change in the phrase of his expression, because I paid no attention to it at the time at all."

On cross-examination he gave this version:

"He said, 'Here, Red' or 'Redmond,' which I don't remember, 'is the key for the Mercantile Trust Company box, and the contents is yours' or 'all yours.' Now, I don't want to be put down as saying that he might have used the word 'all.' I had no interest whatever in it, and never thought to pay any attention about it.

"Q. All right; now, as to Mrs. Hackmann? A. He turned to Mrs. Hackmann and says, 'Mary, here is the key for the Mississippi Valley Trust Company, and the contents of this box is yours.' "

Linde's deposition was taken in June, 1931. At that time he gave the statement this way:

" 'This key for the Mississippi Valley' I believe safety deposit box, I imagine that it what they were, mentioning the two banks led me to believe they were safety deposit box keys." The witness then continued:

"He said, 'Red,' or 'Redmond,' 'this is for you,' and then 'Mary' or 'Mary Belle,' I have always known him to say Mary, 'here is the key to the Mississippi Valley."

In that statement of the conversation he did not mention anything but the giving of the keys. On cross-examination in that deposition the witness said:

"Q. And did he say at the time he gave the keys, 'I give you the contents of those boxes?' A. Yes, he said, 'These are the keys to your boxes.'

"Q. And did he say, 'I give you the contents?' A. He said, 'They are for you to open up.'

Mrs. Hackmann's testimony on behalf of her brother used this language:

"Here is the key to my box at the Mercantile Trust Company. All of the contents of that box is yours."

On cross-examination:

"Redmond, this is the key to the Mercantile Trust Company. The contents is all yours."

Again on cross-examination: "All the contents are for you."

Statement of witnesses, Exhibit 5, October 24, 1930:

"Red, this is the key to my box at the Mercantile Trust Company. I give you all of its contents."

Katie Loftis gave it in this way:

"I went in there to get some change and Mr. Halpin reached his left hand over the chair to get his trousers and he pulled out the change and the keys with his right hand and then he handed Mr. McBride a key and said: 'Here, Redmond, is the key to my safety-deposit box in the Mercantile Trust and the contents of that is all yours.' Then he handed a key to Mrs. Hackmann and says: 'Mary, all the contents of'—was all hers at the Mississippi Valley. . . . Then he gave me the change; and Mr. Linde was saying—well, he says, 'Mr. Halpin, I hope you will get well,' and just as he was going to go out he says, 'No, I will never get well.'"

She quoted Mr. Halpin in speaking to McBride, as follows:

"Here, Redmond, is the key to my safety-deposit box in the Mercantile Trust and the contents of that is all yours."

On cross-examination:

"Here, Redmond, is the key to my box at the Mercantile Trust. The contents are yours."

Statement of witnesses October 24, 1930:

"Red, this is the key to my box at the Mercantile Trust Company. I give you all of its contents."

She quoted Mr. Halpin, in speaking to Mrs. Hackmann, as follows:

"Mary, all the contents of"—was all hers at the Mississippi Valley.

Cross-examination:

"Here, Mary, is the key to my box down at the Mississippi Valley, and all the contents of that is yours."

Further, on cross-examination:

"Here, Mary Belle, is my key to the Mississippi Valley Trust Company box. The contents of that are for you."

Statement of witnesses, Defendant's Exhibit 5, October 24, 1930:

"Mary Belle, this is the key to the box at the Mississippi Trust Company. All of the contents of that I give you."

Redmond McBride in his sister's case quoted Mr. Halpin as follow:

Direct examination:

" 'Mary, here is my key for the Mississippi Valley Trust Company box. The contents of it is yours.' "

On cross-examination:

" 'Here, Mary, is my key for the Mississippi Valley Trust Company box, and the contents are for you.' "

Statement of witness October 24, 1930:

" 'Mary Belle, this is the key to the box at the Mississippi Trust Company. All the contents of that I give you.' "

The witness McBride testified that he did not speak to anyone about the key episode before he told Mr. Leahy about it.

These witnesses were cross-examined at great length by respondent's counsel as to how many were in the room at the time, which came in first and which went out first; with which hand Mr. Halpin reached for his trousers, and with which hand he took out the keys and to whom he gave the first key—to Mrs. Hackmann or to Mr. McBride. Did he give the money to Mrs. Loftis for the butcher before he handed the keys or afterwards? Of course the witnesses were very indefinite and uncertain about the sequence of those trifling incidents.

The respondent lays great stress upon the conflicting statements as to what was said by Mr. Halpin at the time he was said to have given the keys. That Mrs. Hogan should say, "The contents are yours" and another time "the contents are all yours." Again, "I give you all of its contents;" again, "I give you the contents of this box," and further "the contents are for you."

It is argued that this fails to show with definiteness the terms of the alleged contract and it shows a confusion in the minds of the witnesses as to just what was said so as to make her evidence unworthy of belief. That same objection applies to each one of the five witnesses who testified as to the incident. Fundamentally, no doubt, counsel for respondent is of the opinion that the incident did not occur at all; that there was no such delivery of the keys, and no statement made similar to what was testified to; that the witnesses are thoroughly discredited because of the conflicting statements as to what was said. We do not agree with that view. The testimony of George Linde indicates that he was thoroughly con-

fused or was reckless in disregard of the truth, but his lack of credibility cannot be imputed to the others. Each must stand alone. If each one of the witnesses had sworn to exactly the same language used by Mr. Halpin in delivering the keys to his son and daughter, if he delivered them, and had stuck to that same language throughout each cross-examination and in each statement they made, we would regard it as a strong circumstance to discredit each one of them, indicating that the language had been "learned." by them and repeated as learned. It is a matter of common knowledge among lawyers, that if five witnesses, or any number of witnesses, would hear a statement similar to what Mr. Halpin is said to have made, no two of them would agree the next year, the next day or the next hour as to what was the exact language used. The same person probably would remember it one way one day and differently the next. The *words* used would not stick in the mind of ordinary persons who heard them. They would not remember who came in first and who went out first, or with which hand the sick man reached for his trousers, or with which hand he handed the keys, or to whom he handed a key first. Yet one significant thing would cling in their memories: here was a most unusual incident; Halpin was giving to his son and daughter, each, near a half million dollars. Every person present knew he was wealthy. Probably all of them knew the form in which his wealth was kept, in securities and safety deposit boxes. They all knew, at least they seemed to know, that he expected to live but a short while. He said at the time that "the end is not far off." He didn't expect to get well. They were all devoted friends of his. Naturally when he would take a key of such importance and hand it to his son the *significance* of what he said, not the words, would dwell in the memory of each person who heard it. What difference does it make whether he said "The contents are yours," "the contents are all yours," or "I give you the contents?"

The respondent draws a distinction between those expressions, claiming the words "the contents are yours," was merely a statement of what had already happened; he had given it to them in his will. He could not have meant anything of the kind, because the two wills which were introduced in evidence, one succeeding the other, had given this son and daughter his total property, undivided. It was not separated or segregated as to each. With his clear, logical mind Halpin would not have confused the two. These gifts separate the property into two parts, each placed in a separate trust company and in each case present control is given. The witnesses are not to be discredited by their differences from each other as to what was said and as to what each remembered at different times. The significance of the words is practically, if not exactly, the same.

Other circumstances are mentioned which tended to impeach Mrs. Hackmann and Mr. McBride. McBride turned the keys over to the trust companies on the death of Mr. Halpin, saying nothing about any claim to the contents of his box. He and Mrs. Hackmann were present at the inventory and made no claim. McBride did claim $84,000 worth of bonds in one box but mentioned no other at the time. It appears from his testimony that he did not appreciate the significance of the gift until later. A will contest was filed by some collateral heirs in 1930, and while that was pending these witnesses made statements which included an account of what occurred at the time of the alleged gift. It was then that Leahy told McBride that that was his property already. Later he and Mrs. Hackmann made claim to it. It is argued by appellants that there was no particular significance to McBride's failure to make claim earlier because as holder of the keys and in giving them up he was complying with the general practice prevailing as to trust companies who act as executors to turn over the keys and let them take stock of such property so as to satisfy the State Treasurer and Attorney-General as to the inheritance taxes due and owing the State. Judge HENNING was sent for and his advice was asked about it.

Whatever the reason, the failure of the plaintiffs to make their claims at first no doubt tells strongly against them but only as tending to discredit their testimony and the good faith of their claims. If in fact the gifts were made as claimed, their failure promptly to claim would not defeat them.

Does this evidence, of these witnesses, uncontradicted as it is by the other direct testimony, utterly fail to make out a case which would justify a finding that the gift was made? The rule in relation to the character of evidence set out in 28 Corpus Juris, pages 704, 705, is quoted in part by respondent's counsel:

"Gifts *causa mortis* will be sustained only upon clear and satisfactory proof of all the essential facts necessary to constitute such a gift; or, as has been variously said, the evidence must be cogent, full and conclusive, clear and unmistakable, definite, clear and convincing, clear, convincing, strong, and satisfactory, of the clearest and most satisfactory character, of the clearest and most unequivocal character, or, even according to some authorities, 'free from uncertainty,' or sufficient to establish the gift beyond doubt, or beyond a reasonable doubt. It has been expressly held, however, that proof beyond suspicion or beyond a reasonable doubt is not required."

The rule in relation to gifts *causa mortis* is the same as in relation to gifts *inter vivos,* and in cases where there is no suggestion of fraud or undue influence very slight evidence will suffice. [28 C. J. pp. 676, 678; Jones v. Jones, 201 S. W. 557.]

274

In some cases it is held that a parol gift from a parent to his child can be established only by clear and convincing evidence, though in other cases it is said to require less positive and unequivocal testimony to establish a gift from a father to his children than in cases of other persons where they are not so related. [12 R. C. L. 973.] It is said in the Jones case:

"Less positive and unequivocal proof is required to show the delivery of a gift from a parent to a child, than between parties not so related."

There is no suggestion of undue influence in this case. Just the contrary is asserted by the respondent—that Halpin was a man of determined will and uninfluenced by sentiment or subtle emotion. This argument is made to discredit the witnesses. In regard to the neglect of these plaintiffs to make an earlier demand the rule is thus stated in 28 Corpus Juris, 672-673:

"The acceptance of a gift, beneficial to the donee and otherwise complete, will be presumed, unless the contrary is made to appear, even though the donee did not know of the gift at the time it was made."

In the Foley case, supra, it was said that the evidence to establish a gift causa mortis must satisfy the judicial mind beyond a reasonable doubt, before it may be held to be established. It may be noted that the passage from Corpus Juris copied above refers to evidence from various states, and Missouri is the only state from which any case is cited requiring proof beyond a reasonable doubt. That the proof must be clear and cogent applies generally. In the Foley case it was not necessary to a determination of the case that the proof must satisfy this court beyond a reasonable doubt, l. c. 580, 589. Circumstances very similar to those here were put forward for proof of delivery of a key to a safe deposit box, but the proof offered was the testimony of a single witness, a boy eighteen years of age, whose testimony in its essential features was discredited in his cross-examination. The statement of the court, page 589, in analyzing the facts in regard to his testimony, said:

"It is not a plain straightforward statement of a transaction witnessed by a frank person, stating the truth in such a manner as to carry weight and conviction with it. It is contradictory upon material points, uncertain in character, hesitating in delivery, and shows a want of clear conception of what took place upon the occasion of the alleged gift. It falls far short of the weight required by the rules of evidence before mentioned, and its probative force and convincing power is lacking in that same proportion."

In that view of the testimony it was wholly unnecessary for the court to hold that the proof should be beyond a reasonable doubt.

The witness not only did not understand what was said in detail, but failed to understand the significance of what was said at the time of the alleged gift. Then, too, the witness was indirectly interested as the son of the claimant who was no relation to the donor.

If the testimony of Linde were all we had here it would fairly match the proof in the Foley case.

In this case there are five witnesses, two of them at least totally disinterested except as friends. The donees were bound by the closest ties of relationship and intimacy to the donor. They were the persons who under his will were to have the property. It is claimed that the circumstance was unusual, with a man of Halpin's character and disposition. But there appears no reason why he should desire to tie up his property for ten years in a trust rather than hand it over to the beneficiaries, already old, at once. There is no suggestion of anything in their character or habits which would prevent their taking care of it. The only interest the respondents have in this matter is the emoluments which would accrue to it by reason of discharging the trust. It is not even claimed that it is for the benefit of the estate that the trust should be continued. The feature which more than anything else weighs against the veracity of those witnesses who swore to the gift is the unusual circumstance of the five persons happening to be there at the particular time, and that the sick man suddenly, without previous warning, concluded to make the gift in the manner he did. It was singular. Yet we know that in lawsuits many things that do not look reasonable are proven and believed by judges and juries, and that some times incredible facts are thoroughly proved by unimpeachable testimony.

The only theory on which it could be said that the evidence lacks cogency is that the witnesses were unworthy of belief *in toto*, that the testimony produced by plaintiffs was wholly and deliberately false.

This is an action at law. It was for the trial court to believe or disbelieve the witnesses. If that court had believed what they said we could not assume that the judge was not convinced by evidence of sufficient clearness and cogency of the fact and of the good faith of the alleged gifts.

But the court found against the plaintiffs. Absent errors in the trial we would have to say with respondent that the finding was equivalent to a special verdict and on the record was justified in finding the evidence did not meet the requirement of the law as to clearness and convincing cogency. That makes it necessary to determine whether the court erred in the trial of the case in such way as to invalidate the conclusion reached.

III. Appellants claim that the court erred in each case in failing to make a finding of facts separately from conclusions of law as required by Section 952, Revised Statutes 1929, as follows:

"Upon the trial of a question of fact by the court, it shall not be necessary for the court to state its finding, except generally, unless one of the parties thereto request it with the view of excepting to the decision of the court upon the questions of law or equity arising in the case, in which case the court shall state in writing the conclusions of facts found separately from the conclusions of law."

The statute does not require the trial court to make a finding of fact unless requested to do so by one of the parties to the suit.

At the conclusion of the evidence the plaintiffs handed to the court a statement in each case purporting to be a finding of the facts and requested the court to find the facts as thus stated. This the court refused to do.

The defendant likewise in each case requested the court to find the facts, and to find the facts according to a statement which it presented to the court and the court made and filed that finding in each case. We are not willing to say that the presentation of such a statement is a *request* in accordance with the statute that the *court* find the facts. It is a request that the court approve the facts as stated, and not that the court make its own findings. However, the respondent treated the matter as if the request for the finding was in proper form, and itself made the same kind of request to the court. Therefore, we will treat the matter as if the formal request in compliance with the statute had been made by the plaintiffs in each case.

The appellant complains that the only facts found by the court are those about which there is no dispute; so far as the specific facts are concerned that is correct. The finding in each case given by the court recited the undisputed facts in relation to the beginning of the business of James McBride, his business career, his three children, his death, the marriage of his widow to Thomas Halpin, and the latter's successful conduct of the business until he accumulated a great fortune, his manner of renting and managing the safety deposit boxes in the Mercantile Trust Company and in the Mississippi Valley Trust Company; his making of three wills and providing for these plaintiffs, the delivery of the keys to the safety deposit box to the defendant by Redmond McBride, and in the Hackmann case closes with this statement:

"9. The property mentioned in plaintiff's petition herein, with the exceptions noted in defendant's amended answer, was in Thomas Halpin's safety deposit box at the Mississippi Valley Trust Company at the time of his death. Plaintiff claims ownership and the

right to the possession thereof by virtue of a gift thereof to her *causa mortis* from the said Thomas Halpin. The evidence is not sufficient to convince the court that such a gift was made and the court finds that said property was owned solely by the said Thomas Halpin at the time of his death.''

The finding in the McBride case closes with the same general conclusions.

That is not a finding of any fact in dispute. It is a general conclusion necessarily implied in the finding for the defendant and entirely superfluous. The matter in issue was whether or not Thomas Halpin, a short time before his death, delivered the key to the safety deposit box in the Mississippi Valley Trust Company to Mrs. Hackmann, and the key to the box in the Mercantile Trust Company to McBride, with a statement to each one indicating a gift. That was the issue. The entire case turned upon it. The finding of facts in the Hackmann case states how Thomas Halpin was brought to his home from the hospital November 12th, that he was fatally ill and reasonably believed that death was near, and that he died December 10, 1929. That a few days thereafter Redmond McBride delivered to the defendant, successor to the Mercantile Trust Company, the keys to the safety deposit box in said company and delivered to the Mississippi Valley Trust Company Halpin's key to a safety deposit box in that company—there was no other mention of the key—that the defendants filed in probate court the will of Thomas Halpin; it was admitted to probate and defendant in good faith inventoried the contents, and ever since in good faith, as executor aforesaid, has been administering the assets of the property aforesaid of Thomas Halpin. That the plaintiffs were present during the time of the inventory and though represented by counsel made no claim of a gift of the property; that plaintiff's counsel, October 24, 1930, prepared a statement, Exhibit 5, and also Exhibit 6, signed by Margaret Hogan and delivered those exhibits to the defendant.

Thus the finding recites briefly all the evidence offered by the defendant tending to impeach plaintiffs' witnesses, but mentions no evidence of such witnesses, and makes no finding as to whether or not the incident upon which each case turns, as testified to by the plaintiffs' witnesses, occurred in the manner in which they swore to it, or had any basis in fact. Certainly the statute was not complied with. We cannot tell from the conclusion reached by the trial court whether it found all the plaintiffs' evidence in that respect was perjured, and that the incident did not take place at all. We are left in doubt as to whether the court concluded, even if those witnesses for the plaintiffs told the truth, that the facts were insufficient to vest the title in appellants; insufficient in form to constitute a

278

gift. It is said by this court in Korneman v. Davis, 281 Mo. 234, l. c. 246, 219 S. W. 904, 908:

"A statutory finding of facts, as this purports to be, should embrace all the material facts bearing on the issues involved, and should set them out in detail, and not merely state conclusions or inferences therefrom."

This is the uniform holding in this State as the interpretation of the statute. [St. Louis Hospital Assn. v. Williams' Admr., 19 Mo. 612; Sutter v. Streit, 21 Mo. l. c. 159; Allison v. Darton, 24 Mo. 343, l. c. 346.] That was a replevin case. The court said:

"The finding is that the defendant did wrongfully detain the property. This is not a sufficient finding of the issue."

That was exactly the finding here. The trial court, therefore, erred in failing to make a finding of facts.

IV. The appellant claims the court erred in admitting in evidence the several wills made by Thomas Halpin during his lifetime. We think the evidence was competent for the purpose of showing the relation of the parties, competent in the same way as the evidence to show Halpin's management of the different safety deposit boxes which he held from time to time.

The judgment is reversed and the cause remanded. All concur.

---

*NOTE: Opinion filed at October Term, 1931, March 15, 1932; motion for rehearing filed; motion overruled at April Term, April 12, 1932.