Charles D. LOVELESS, Appellant,

v.

LOCKE DISTRIBUTING COMPANY, Inc., and Frankfort Eugene Turner, Respondents.

No. 45860.

Supreme Court of Missouri,

Division No. 2.

March 10, 1958.

Opinion Modified on Courts Own Motion and Modified Opinion Filed May 12, 1958.

Rehearing Denied May 12, 1958.

Riddle & Baker, Veryl L. Riddle, Charles H. Baker, Malden, for appellant.

Jones & Jones, Kennett, for respondents.

STORCKMAN, Presiding Judge.

Plaintiff obtained a verdict and judgment for $10,000 for personal injuries and damages resulting from a collision between his automobile and a motor truck of the defendant Locke Distributing Company, Inc. Defendants' motion for new trial was sustained and the plaintiff appealed.

The accident occurred August 4, 1954, around noontime, on County Highway B in Dunklin County about 1 1/10 miles west of Holcomb, Missouri. The highway, which runs generally east and west, is of blacktop construction, the paved portion being about 20 feet wide. A bridge at the place in question is 22 feet wide and elevated about 1 1/2 feet above the surface of the highway. There are guard rails and markers on the sides of the bridge. From the east end of the bridge the highway curves to the northeast or to the left of a traveler coming from the west.

The plaintiff, aged 65, was driving his 1938 Chevrolet automobile westwardly accompanied by his 17-year-old stepson, Billy Dean Vaughn. The defendant Turner, age 29, a driver-salesman for the defendant Locke Distributing Company, was driving the company's 1948 Dodge one and one-half ton delivery truck in an eastwardly direction. The truck, equipped with dual wheels

in the rear, was loaded with 180 cases of beer weighing approximately 8,100 pounds. The collision occurred shortly after the truck had crossed the bridge. The left front of plaintiff's automobile was damaged to such an extent that it could not be driven after the accident. The damage to the truck was in the area of the left rear wheels; a tire on one of the dual wheels was blown out and there was damage to the brake system.

It was also undisputed that after the accident plaintiff's automobile was on the north side of the highway about 41 feet east of the bridge headed slightly southwest with the right rear wheel on the gravel shoulder and the other wheels on the pavement; and defendant's truck was 300 feet or more east of the bridge on the south side of the highway.

Plaintiff's evidence tended to prove that plaintiff had stopped his automobile about 30 feet east of the bridge on the north side of the highway with the wheels on the right side about a foot and a half off the pavement in order to permit the truck to cross the bridge ahead of him, and that the automobile was in this position when it was hit by defendant's truck. The defendants contended that the collision occurred about 113 feet east of the bridge on the south side of the pavement in the eastbound lane of travel, and that plaintiff's automobile was in motion.

The plaintiff's case was submitted solely on the issue of whether the defendant Turner negligently failed to operate the motor truck on the right-hand side of the highway. The essential fact question presented to the jury was whether the collision occurred on the north side of the highway in plaintiff's lane of travel or on the south side in the proper path of the motor truck.

The verdict and judgment were rendered May 16, 1956. The defendants' motion for a new trial, filed May 22, 1956, was sustained on August 17, 1956, with this statement of record by the trial court: "De-

fendants granted new trial because verdict is excessive, and secured in part by perjured testimony." The motion for new trial charges that: "Said Billy Dean Vaughn has committed perjury in his testimony given before this Court."

The motion for new trial was ruled on 87 days after its filing and 93 days after the verdict and judgment were rendered. Since this was done more than 30 days after entry of judgment, the trial court could not order the new trial of its own initiative, or on any ground not specified in the motion. Sec. 510.370, RSMo 1949, V.A.M.S.; 42 V.A.M.S. Sup.Ct. Rule 3.25; Ridenour v. Duncan, Mo., 246 S.W.2d 765. 767 [1]; Birmingham v. Kansas City Public Service Co., 361 Mo. 458, 235 S.W.2d 322, 324 [1]. It follows that the order for new trial can only be justified on the ground that Billy Dean Vaughn committed perjury since that is the only specification of perjury in defendants' motion for new trial.

Supreme Court Rule 3.22, insofar as it relates to new trials on the ground of perjury, provides: "The court may award a new trial of any issue upon good cause shown and in any case where * * * the court is satisfied that perjury or mistake has been committed by a witness, and is also satisfied that an improper verdict or finding was occasioned by any such matters, and that the party has a just claim or defense, it shall, on motion of the proper party, grant a new trial, * * *." See also § 510.330.

The appellant's first contention is that the charge of perjury in respondents' motion for a new trial was not a sufficient compliance with Supreme Court Rule 3.23 to preserve the question for review. However, since the motion for new trial was sustained, we do not rule this contention but will review the record to determine if there is legal justification for the order made.

In one of the early cases involving the then new statutory provision for appeals from an order granting a new trial and other interlocutory orders, it was stated that within the limit of the record brought up for review " * * * it is not only our prerogative, but obvious duty, to review the action of the circuit court, and determine from the law and the facts of the case whether the circuit court exercised a sound judicial discretion * * *" in granting the defendant a new trial. Merriam v. St. Louis, C. G. & Ft. S. Ry. Co., 136 Mo. 145, 36 S.W. 630, 631. See also Bushman v. Bushman, 311 Mo. 551, 279 S.W. 122, 125 [2].

In their brief, defendants assert that Billy Dean Vaughn committed perjury when he testified: (1) that the collision occurred 30 feet east of the bridge; (2) that the "right two" wheels of plaintiff's car were off and the "left two" were on the pavement; and (3) that plaintiff's car was stopped when the collision occurred. They state that Vaughn's perjury is shown by "his testimony in the instant case before this court, his testimony in a previous trial of this same cause before the same trial court on April 6, 1955, and his testimony given by deposition on February 13, 1956," and that "A careful reading of the testimony of Billy Dean Vaughn * * *, and his testimony given in the former trial * * *, will divulge the perjury of this witness in attempting to make his testimony conform to certain physical facts to be hereinafter referred to which were brought out at the first trial of this cause." Thus it appears that the defendants rely upon prior inconsistent testimony of the witness Vaughn and conflicts between his testimony and "physical facts" alleged to have been established by the defendants' evidence to support the charge of perjury.

The "physical facts" to which the respondents refer is the testimony of highway patrolman J. L. Petty and the defendant Turner. Petty investigated the accident and testified that he found dual wheel skid marks on the south side of the highway; that the ones furtherest north were

6 feet from the south edge of the pavement, were 8 feet long and stopped 113 feet from the east end of the bridge, and there was another skid mark near the right edge of the pavement. Petty did not undertake to say that the marks were made by defendant's truck or under what circumstances they were made. He did not testify that he found any debris on the pavement. Turner testified that the force of the collision "knocked the duals out, and that's when it stopped skidding." On this premise the respondents conclude: "It necessarily follows as a physical fact that this collision occurred at a point 113 feet east of the Dunklin County Highway B at a point on the south side of said highway, which would have been Respondent's proper side of the highway. The reason for this is that it would have been an impossibility for the truck to put down skidmarks after the brake hose had been broken."

We cannot agree that the testimony of Petty and Turner establishes as a *physical fact* that the collision occurred 113 feet east of the bridge or that skid marks could not be made by the truck after its air brakes were damaged. There was no evidence that the truck was wholly without brakes after the collision, and see § 304.560 (3) requiring two sets of adequate brakes. Plaintiff's witness Frank Long testified that he found marks on the north side of the pavement 29 feet east of the bridge. From this and other evidence the jury could reasonably find that the collision occurred at that point as claimed by the plaintiff. The question was distinctly one of fact for the jury upon the conflicting evidence.

Vaughn was 17 years of age at the time of the accident. His formal education stopped at the sixth grade and it is apparent from the transcript of his testimony at the two trials that his powers of understanding and description were limited. He testified at the second trial that the plaintiff stopped his automobile "about 30 feet" east of the bridge with the two wheels on the right side about a foot and a half off of the pavement onto the shoulder, and that the car was in this position when the collision occurred. The plaintiff testified to the same effect and on some phases there was corroboration by plaintiff's witness Frank Long.

By agreement of counsel the complete transcript of Vaughn's testimony at the first trial was introduced in evidence and appears in the transcript on appeal. Although for reasons of brevity we are reluctant to do so, but because of its basic importance to the question presented, we set out in full Vaughn's testimony at the previous trial on April 6, 1955:

"Direct Examination by Mr. Riddle:

"Q. Your name is Billy Dean Vaughn? A. Yes, sir.

"Q. And are you a stepson of Mr. Loveless? A. Yes.

"Q. And do you live with him at home at this time? A. Yes, sir.

"Q. How old are you? A. 18.

"Q. Billy Dean, were you with your stepfather on August 4th, 1954, at the time that there was a collision? A. Yes, sir.

"Q. And what part of the car were you riding in? A. I was riding—let's see—

"Q. In the front or back seat? A. Oh, in the front seat.

"Q. And who was driving the car at that time? A. My stepdad was.

"Q. Your stepfather was? A. Yes.

"Q. Now, then, before this accident happened, did you see the beer truck? A. Yes, I seen it coming right across the bridge, weaving on our side.

"Q. And when you first saw it, where was the beer truck, Billy Dean? A. When I first saw it?

"Q. Yes. A. It was coming around that curve.

"Q. On which side of the bridge, east or west side? A. On this side, towards Piggott.

"Q. That would be on the west side? A. Yes.

"Q. Did you see it come across the bridge? A. Yes.

"Q. What part of the bridge was it on, if you will please, tell the Court and jury? A. He was on our side.

"Q. And at what point of the road, with reference to the bridge, did the accident actually happen, where on the road did the wreck actually happen, Billy Dean? A. Well, there is a little road right there, it happened pretty close to it, but he run off right there at that road and he stopped.

"Mr. Jones: Excuse me, Your Honor, I didn't get that answer.

"The Court: I didn't understand it either.

"The Witness: Well, he got to a dirt road there; sand road, and he seen—we seen a beer truck coming, and he went off right there where the dirt road is, went off the pavement.

"Q. (By Mr. Riddle) When you say we, who do you mean by that? A. He did.

"Q. That is your stepfather? A. Yes, and went off and stopped.

"Q. And stopped? A. Yes, and the beer truck hit him.

"Q. Now, then, which side of the road did your stepfather stop his car on, your right or left side? A. Well, I get balled up on that, now, the steering wheel, ain't it on the left-hand side?

"Q. Yes. A. He stopped on the right-hand side then.

"Q. And was his truck moving or —I mean was your stepfather's car moving or stopped when the truck hit it? A. He was stopped.

"Mr. Riddle: That is all, you may question.

"Cross-Examination by Mr. Jones:

"Q. Billy, you weren't injured in the wreck, were you? A. No, all I had is three gashes cup up here (indicating).

"Q. You weren't knocked unconscious or anything? A. I was knocked crazy a little.

"Q. What? A. I was what you call knocked crazy.

"Q. You were knocked crazy? A. Yes.

"Q. Did you see the cars after the wreck? A. After the wreck?

"Q. Yes. A. No, I wasn't paying no attention to it, I had been taking care of him, getting him out of it, I didn't pay no attention to it.

"Q. How long before the wreck was it that your stepfather talked to you about having the car fixed? A. Well, I don't know exactly how long it was.

"Q. What did he tell you about having his car fixed? A. Well, he was there, and the 'denser, run in and fixed the 'denser.

"Q. Fixed what? A. That 'denser, have it fixed, have a new one put on it, that's all that would be wrong with it.

"Mr. Riddle: I don't understand what you mean, you say 'dancer'?

"The Witness: Yes.

"Q. (By Mr. Jones) Where is it located on the car?

"Mr. Loveless: He means condenser on the motor.

"Mr. Jones: If the Court please, we don't want Mr. Loveless testifying.

"The Court: Yes, you be quiet, Mr. Loveless, you do enough talking when you are on the stand.

"The Witness: Nothing was wrong with the driving of it though.

"Q. (By Mr. Jones) What was it he was going to have fixed? A. Well, I call it a 'denser, is what I call it, you know, make the car cut out on him, making the car miss on him.

"The Court: You mean condenser?

"The Witness: Yes, make the car cut out.

"Q. (By Mr. Jones) Now, Billy, about where were you all in regard to this bridge when you first saw this truck? A. About where we was?

"Q. Yes. A. Well, I didn't know, I just seen the truck coming around the curve. Where we went off, though, was at the sand road.

"Q. Went off into a sand road? A. No, where we went off was by the sand road.

"Q. How wide is the highway there, Billy? A. I just exactly don't know.

"Q. About how wide?

"Mr. Riddle: Your Honor, I object to that, he said he doesn't know.

"The Court: Yes, sir, sustained. If he doesn't know he can't tell you.

"Q. (By Mr. Jones) How far off the road did you pull your car off? A. Well, I didn't measure that neither, I know it went off the highway though.

"Q. You know you were off the highway, and you know you were stopped and that truck came all the way over there and hit you. Now, you know that? A. Yes, I know that.

"Mr. Jones: That's all.

"Mr. Riddle: That's all, Billy Dean."

During cross-examination at the second trial, the witness Vaughn admitted that in his deposition taken on February 13, 1956, he had testified that all four of the wheels of plaintiff's automobile were off the road on the right-hand side when the collision occurred. Asked to explain this testimony given in his deposition, Vaughn stated: "Well, you got talking so fast and got me tore[1] up, and I might have said four, but I meant two. I tried to tell the truth"; and, "Well, another time I got tored up, and I try to tell the truth if I can." The extent to which plaintiff's car was off the north side of the road at the time of the accident is the only respect in which the respondent claims Vaughn's testimony at his deposition was contrary to that he gave at the trial.

The charge that Vaughn committed perjury in testifying that the plaintiff's car was stopped when struck may be readily disposed of. He testified at both trials that the car was stopped, and there is no showing that he testified to the contrary on his deposition. The respondents do not attempt to justify this accusation beyond its bare assertion.

The transcript of Vaughn's testimony at the first trial does not reveal any contradiction with his testimony given at the second trial that the automobile was stopped about 30 feet east of the bridge when it was struck. He was not asked at the first trial to estimate the distance from the east end of the bridge to the place

[1] Webster's New Int. Dictionary (2d Ed.): "Tore. Past tense and dial. past part. of 'tear.'"

where the collision occurred. He did testify that the accident happened "pretty close" to a little road which defendants' evidence tends to prove is approximately 113 feet east of the bridge. His previous testimony is susceptible of the construction that the side road was the point where the plaintiff drove the automobile partially off the pavement and commenced the application of the brakes. We find nothing in the previous testimony which precludes the possibility that the plaintiff did not bring his automobile to a complete stop until it was approximately 30 feet east of the bridge. Vaughn testified that he had gone to the scene of the accident the day before the second trial and stepped off the distance from the east end of the bridge to the point where the wreck occurred. His estimate of the distance appeared to be based on that experiment. No discrepancy is disclosed on this score from the testimony given on deposition.

The other aspect of Vaughn's testimony which the respondents claim is contradictory and perjurious is the extent to which plaintiff's automobile was off the pavement at the time of the collision. At the present trial he testified that the two wheels on the right side were about 18 inches off the pavement onto the gravel shoulder. At the first trial he testified that the automobile was off the pavement, but when asked the distance his answer was, "Well, I didn't measure that neither. I know it went off the highway though." He was not asked whether all the wheels were off the pavement.

▮ The witness admitted that he testified in his deposition that all four wheels of the automobile were off the pavement and on the shoulder when the wreck occurred and that no part of the car was on the road after the wreck. Thus the only clear contradiction in Vaughn's testimony results from the statements made in his deposition relating to the extent to which the automobile was off the road and on the shoulder at the time of the accident. In

Johnson v. St. Louis Public Service Co., 363 Mo. 380, 251 S.W.2d 70, 73 [2], it was held that the inconsistencies between the testimony on deposition and at the trial "went only to the credibility of plaintiff and did not destroy her testimony at the trial." See also Ritz v. Cousins Lumber Co., 227 Mo.App. 1167, 59 S.W.2d 1072, 1074–1075 [2]; Pettitt v. Kansas City, Mo. App., 267 S.W. 954, 956 [2].

▮ The determination of the materiality of alleged false testimony is a question of law for the determination of the court. State v. Swisher, 364 Mo. 157, 260 S.W.2d 6, 13 [13]; Dolan v. United States, 8 Cir., 218 F.2d 454, 457 [2], certiorari denied, 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255. In the circumstances of this case, it is not material to the issue on which the case was submitted whether plaintiff's automobile was completely or partially off the highway. In either event defendant's truck would have had to be on the wrong side of the highway in order to collide with plaintiff's automobile. The extent to which plaintiff's automobile was onto the north shoulder went to the amount of defendants' transgression into the westbound lane of travel. Vaughn's prior inconsistent statement in this regard, even considered as substantive evidence, did not tend to disprove defendants' liability under the issue submitted.

▮ A mere showing that a witness on previous occasions made statements contradictory of his testimony at the trial is not sufficient to establish perjury in the absence of other evidence proving or tending to prove that the previous statements were true. In State v. Carter, 315 Mo. 215, 285 S.W. 971, the conviction of a defendant charged with perjury was reversed and he was discharged, the court stating: "It was not sufficient to prove only that appellant made statements concerning such acts and admissions contradictory to his testimony when sworn and examined as a witness in respect thereto." In Sly v. Union Depot Ry. Co., 134 Mo.

681, 36 S.W. 235, 238 [3], the court stated: "Whatever witnesses in this case may have testified to in others, although of a similar character, has no tendency to sustain the charge of perjury in this. At most, such affidavits only tend to impeach the credit or character of the witness against whom made, and a new trial is rarely ever granted upon that ground. Mayor of Liberty v. Burns, 114 Mo. 426, 19 S.W. 1107, and 21 S.W. 728, and authorities cited."

■ Furthermore, much of Vaughn's testimony was estimates or approximations of distance and location. The rule is well established that estimates of distance or the position of an automobile at the time of an accident are not conclusively binding on a party, and we can see no reason why a witness should be held to greater accountability. Zumault v. Wabash Railroad Co., Mo., 302 S.W.2d 861, 864 [6]; Williams v. Ricklemann, Mo., 292 S.W.2d 276, 280 [2]; Smith v. Siercks, Mo., 277 S.W.2d 521, 525 [3]; State ex rel. Thompson v. Shain, 351 Mo. 530, 173 S.W.2d 406, 407 [2]. Generally a charge of perjury cannot be predicated upon a mere expression of opinion. 70 C.J.S. Perjury § 5, p. 462; State v. Fannon, 158 Mo. 149, 59 S.W. 75, 77; State ex rel. Burton v. Allen, 312 Mo. 111, 278 S.W. 772, 773 [1].

■ In any event, lack of credibility on Vaughn's part could not be imputed to other witnesses so as to leave the verdict without support in the evidence. Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372, 376 [5]; McBride v. Mercantile-Commerce Bank & Trust Co., 330 Mo. 259, 48 S.W. 2d 922, 926 [3, 4]. In the McBride case the court stated: "The testimony of George Linde indicates that he was thoroughly confused or was reckless in disregard of truth, but his lack of credibility cannot be imputed to the others. Each must stand alone. * * * It is a matter of common knowledge among lawyers that, if five witnesses, or any number of witnesses, would hear a statement similar to what Mr. Halpin is said to have made, no two of them would agree the next year, the next day, or the next hour as to what was the exact language used."

This is not a case where inconsistent statements alleged to be the basis of the perjury were not suspected or revealed until after the submission and determination of the case. The record shows that the testimony from the prior trial and deposition was offered for impeachment purposes, and this jury had as much opportunity as another would have to evaluate it. See Hart v. Kansas City Public Service Co., Mo.App., 142 S.W.2d 348, 354 [11]; Calvin v. Lane, Mo.App., 297 S.W. 2d 572, 574 [1]; Callison v. Eads, Mo.App., 211 S.W. 715, 716 [3].

■ There is no contention that additional or different evidence could be adduced at another trial. In this situation, the policy of the courts is to expedite and terminate litigation. This policy is expressed in Curry v. Thompson, Mo., 247 S.W.2d 792, 798 [4], 31 A.L.R.2d 1225, as follows: "And courts are, and should be, reluctant to order a new trial, and thus permit the relitigation of once litigated issues, where the point upon which the new trial is sought was in issue upon the trial and was actually there litigated, unless the after-trial facts * * * are of such *decisive and conclusive character* as to render a different result reasonably certain."

■ In support of the order for new trial the respondents also urge that the verdict of the jury is against the weight of the evidence, which is the second ground of defendants' motion for new trial. Since the trial court specified other grounds for sustaining the motion, the presumption is that all grounds not so specified are overruled. Tabler v. Perry, 337 Mo. 154, 85 S.W.2d 471, 476 [5]; Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297, 300 [18]; Heggeman v. St. Louis Public Service Co., Mo.App., 255 S.W.2d 99, 102–103

[1]. On the record it cannot be said that the trial court erred in failing to sustain the motion on the ground the verdict was against the weight of the evidence. See State ex rel. Spears v. Hughes, 346 Mo. 421, 142 S.W.2d 3, 5–6 [4], which ruled a similar situation.

We refer briefly to some other aspects of defendants' evidence tending to support plaintiff's recovery. The defendant Turner testified that the bed or carrying compartment of the truck was "probably twelve feet wide" over-all and 7 feet high. It is incredible that a vehicle of that width could or would be driven on a public highway, but Turner so testified twice during his examination, and there is no other evidence on that score. Turner further testified that he was traveling approximately 30 to 35 miles an hour and as he crossed the bridge his truck got across the center and approximately 3 feet into the north lane of the bridge; that the road dips to the left and that his truck "might have dipped a little bit with the road" as it left the bridge; it could have tilted over some, "just a little bit, which they generally do" at that place. As he left the bridge Turner looked to his right through the rear vision mirrors to see how close he was to the edge of the highway and the two motor vehicles collided about that time. On redirect examination Turner again testified, "I glanced back through my mirror and when I did I felt the impact of both automobiles, the truck and the car." Turner conceded that patrolman Petty was correct in his estimate that plaintiff's car was located about 41 feet from the east end of the bridge after the accident. No plausible explanation was given as to how the Chevrolet automobile in its disabled condition could move westwardly about 72 feet after being struck by the truck loaded with more than four tons of beer. It seems more reasonable that it would be knocked or shoved back about eleven feet, which would be consistent with plaintiff's evidence.

There has been no showing on which it can reasonably be said that an improper verdict was occasioned by the matters complained of. In fact, it appears that the plaintiff recovered in spite of the testimony of Billy Dean Vaughn rather than because of it. Further, there is no showing that the defendants at another trial could produce evidence "of such decisive and conclusive character as to render a different result reasonably certain." Curry v. Thompson, supra.

The record affirmatively shows that the defendants were permitted to present and submit their case fully. We conclude that the award of a new trial on the ground the verdict was "secured in part" by perjured testimony of Billy Dean Vaughn was not legally justified on the record and constituted an abuse of discretion.

In ordering the new trial, the trial court also held that the verdict was excessive. However, the assignment that the verdict was the result of bias and prejudice of the jury is deemed overruled because the trial court specified other grounds for sustaining the motion for new trial. The amount of an award, even if excessive, does not, in and of itself, show bias and prejudice, Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372, 376 [6], and we find no basis in the record for an inference that the jury was so actuated in returning a verdict of $10,000.

A mere excessiveness in the amount of a jury's verdict may be corrected in this court as well as in the trial court by a remittitur rather than by the award of a retrial with its attendant delay and expense. Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S.W.2d 157, 159 [5]; Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S.W.2d 568, 576 [26], 161 A.L.R. 383; Thompson v. St. Louis Public Service Co., Mo.App., 242 S.W.2d 299, 303 [9]. In the Thompson case the trial court set aside plaintiff's judgment and entered judgment

for the defendant. It further ordered that if such action was held to be erroneous on appeal that defendant's motion for a new trial should be sustained on the ground the verdict was excessive. The appellate court reversed the judgment of the trial court and ordered a remittitur, or a retrial on the issue of damages alone. A similar disposition of this case is indicated, especially in view of the fact that there have been two trials already.

The plaintiff testified that the center of the steering wheel struck him in the chest and the rim hit him across the mouth, knocking two of his teeth completely out, and that he was rendered unconscious by the impact. He was confined to his home and bed for about eight months. Since the wreck he has had pains in his chest, in his ribs and in his back under the right shoulder blade. These pains have been "pretty steady." He takes medicine "to quiet them and ease them down." His right shoulder was "in pretty bad shape." The plaintiff was in good health before the accident and had no trouble with his chest.

The kind of work by which he earned his livelihood prior to the wreck was cotton chopping and picking, hauling cotton pickers to work, spraying the inside of houses and barns, and other miscellaneous work. The spray he used was of a kind he attached to his shoulder. Prior to his injury, his income averaged about $150 per month. He has been unable to do any work since the accident, and has had no earnings. His loss of earnings to the time of trial was approximately $3,150. He incurred a hospital bill of $52, doctors' bills of $161, and charges for medicine between $35 and $40. His Chevrolet automobile was a total loss and was sold for junk. No estimate of its value was given.

Two doctors testified as to the extent of plaintiff's injuries. Dr. James H. Turner was formerly connected with the hospital at Piggott, Arkansas, but at the time of trial was practicing in Steele, Missouri.

He treated the patient on seven occasions, the last being on November 12, 1954. When he first saw the plaintiff he was complaining of severe pains in his head and chest, more in his right chest. His chest, lips and head were bruised. The doctor found severe tenderness over the anterior surface of the sternum, the breastbone, and approximately two inches laterally to the right. X-rays of the chest did not reveal any broken bones. The treatment administered was mostly sedation to relieve the pain. The doctor did not advise bed rest, but did advise the plaintiff not to do any work for a time. When the doctor last treated the plaintiff the tenderness of the chest wall was still present. The plaintiff's injuries were disabling for the period during which the doctor treated him.

Dr. Thomas G. Otto, a specialist in orthopedic surgery practicing in Cape Girardeau, examined the plaintiff on two occasions. The first examination was requested by the attorney for the defendant and the last by the plaintiff's counsel. On March 21, 1955, the plaintiff complained of pain and tenderness over the entire right side of the chest from the level of the first rib down to the ninth costal cartilage, and the doctor found tenderness in that area. He found residual stiffness or immobility in the chest muscles. Because of this condition plaintiff's shoulder motion would be painful and its use would be limited by pain. That situation also existed at the time of the doctor's last examination on April 9, 1956. Dr. Otto's opinion was that the plaintiff would have some permanent pain considering his age, and it would be little changed over a period of time. The condition of the shoulder might be improved by manipulation under anesthesia. Such a treatment might be prolonged, and the doctor could not give an estimate of its cost. The limitation of motion in the plaintiff's right shoulder directly resulted from the injuries to the chest muscles. The injuries would be permanent. The defendants offered no medical testimony

or other evidence as to plaintiff's physical condition.

We conclude the judgment is excessive and that a recovery of $7,000 would be within the range recognized under the doctrine of uniformity. No two cases are alike; elements of damage present in one will be missing in another. However, among the prior decisions consulted are the following and the cases therein cited: Darlington v. Railway Exchange Building, 353 Mo. 569, 183 S.W.2d 101, 108 [12]; Johnson v. St. Louis Public Service Co., Mo. App., 256 S.W.2d 308, 314 [11]; Hughes v. St. Louis National League Baseball Club, Mo.App., 218 S.W.2d 632, 640 [8], reversed on other grounds, 359 Mo. 993, 224 S.W.2d 989, 16 A.L.R.2d 904.

The judgment of the trial court is reversed and if the plaintiff will within 15 days remit the sum of $3,000 from the verdict of the jury, the cause will be remanded with directions to enter judgment in favor of the plaintiff for the sum of $7,000; otherwise the cause will be remanded for a new trial on the issue of damages only.

All concur.